LOUISE HARLACH ET AL. *v.* METROPOLITAN PROPERTY
AND LIABILITY INSURANCE COMPANY
(14344)

SHEA, GLASS, COVELLO, BORDEN and BERDON, Js.

Argued October 30, 1991—decision released February 11, 1992

*Donald R. Holtman,* for the appellant (defendant).
*Kerin Margaret Woods,* for the appellees (plaintiffs).

COVELLO, J. This is an appeal from a declaratory judgment that determined that the plaintiffs were entitled to $300,000 of uninsured motorist coverage pursuant to an automobile insurance policy issued by the defendant. The sole issue is whether the insured was bound by his written request for a lesser amount of uninsured motorist coverage when he later claimed that: (1) he did not understand the nature of his coverage; and (2) he did not intend to request a lesser amount of coverage.

The relevant facts are not in dispute. On December 30, 1986, the named plaintiff, Louise Harlach, was injured in an automobile accident under circumstances that entitled her to present a claim under the uninsured motorist provisions of an automobile liability insurance policy issued by the defendant, Metropolitan Property and Liability Insurance Company, to her husband, the plaintiff, John Harlach (plaintiff).[1] The circumstances concerning the amount of uninsured motorist coverage available under the policy are as follows.

---

[1] Although Louise Harlach was the named plaintiff on the complaint, references to the plaintiff throughout the balance of this opinion are to John Harlach.

On February 18, 1980, the defendant issued an automobile liability insurance policy to the plaintiff. The policy provided single limit liability coverage in the amount of $300,000 and uninsured motorist coverage in the amount of $20,000 per person and $40,000 per accident. Each policy renewal thereafter, to and including December 30, 1986, provided the same levels of coverage. Prior to obtaining automobile insurance with the defendant, the plaintiff had dealt with other carriers. Throughout these dealings, the plaintiff always obtained the minimum amounts of coverage required by law.

On July 5, 1983, the General Assembly enacted Public Acts 1983, No. 83-461, amending General Statutes § 38-175c (now General Statutes § 38a-336). The act required that every automobile liability policy "issued or renewed on and after July 1, 1984," was to have uninsured motorist coverage equal to the liability coverage of the policy *"unless the insured requests in writing a lesser amount."*[2] (Emphasis added.)

In October, 1983, in order to apprise its Connecticut policyholders of the change in the law, and in order to give them an opportunity to request in writing lesser amounts of uninsured motorist coverage, the defendant sent to all its policyholders, including the plaintiff, a computer generated notice. The notice invited the reader to "take a minute to read this important letter about a change of the law in Connecticut." The notice

---

[2] General Statutes (Rev. to 1983) § 38-175c (a), as amended by Public Acts 1983, No. 83-461, provided in part: "(2) Notwithstanding any provision of this section to the contrary, every such policy issued or renewed on and after July 1, 1984, shall provide uninsured motorist coverage with limits for bodily injury and death equal to those purchased to protect against loss resulting from the liability imposed by law unless the insured requests in writing a lesser amount, but not less than the limits specified in subsection (a) of section 14-112. Such written request shall apply to all subsequent renewals unless changed in writing by the insured."

stated: "[T]he law was changed to require that your limits of coverage for uninsured motorist must be the same as your liability limits, *unless you request in writing a lower limit.*" (Emphasis added.)

The notice further stated that higher uninsured motorist coverage, equal to the liability limits, would be provided and the "policy premium [would] be adjusted accordingly." The notice advised the policyholders that they could "request a lower limit of coverage at a lower premium" by placing their initials next to the desired option on a tear sheet at the bottom of the notice, signing the same and returning it to the defendant in an envelope that was provided.[3] Finally, the notice provided: "If you have any questions, please contact your sales representative or call our policyholder services department at the toll-free number (800) 422-4272."

On November 8, 1984, the plaintiff, a forty year old college graduate, initialed the minimum coverage option, i.e., "$20,000/$40,000," signed his name "John M. Harlach," dated the form "8 Nov 84," and mailed it to the defendant. On the basis of its receipt of this request, the defendant issued a renewal policy to the plaintiff providing uninsured motorist coverage in the same amount as in prior years, i.e., $20,000 per per-

---

[3] The tear sheet at the bottom of the notice stated: "I UNDERSTAND MY POLICY LIMITS FOR UNINSURED MOTORISTS COVERAGE MAY BE THE SAME, BUT NOT HIGHER THAN MY LIMITS FOR LIABILITY COVERAGE (CURRENTLY XXX,XXX), AND I ACKNOWLEDGE THAT I HAVE BEEN OFFERED THESE LIMITS.

"I HEREBY REQUEST THE UNINSURED MOTORISTS COVERAGE LIMITS INDICATED BELOW WHICH ARE LESS THAN MY CURRENT LIABILITY LIMITS. (NOTE: SELECT ONLY ONE OPTION)

___50,000/50,000   ___300,000/300,000
___20,000/40,000   ___100,000/100,000   ___500,000/500,000
NAME OF POLICY HOLDER   POLICY NUMBER: XXX-XX-XXX-X

_____   _____
SIGNATURE                    DATE                                    "

son and $40,000 per accident. The defendant mailed the renewal policy and five subsequent renewal policies to the plaintiff, each of which reflected the $20,000/$40,000 uninsured motorist coverage limits.

The attorney trial referee found that the plaintiff did not fully understand what protection was provided to him by the uninsured motorist provisions of his policy when he completed and executed the tear sheet, and that he did not understand that "he was giving up his right to insurance coverage of $300,000 for protection for himself and his family in the event he or a family member was injured by an uninsured or underinsured tortfeasor." The attorney trial referee concluded that the plaintiff "did not make a conscious, knowing and purposeful waiver to accept less uninsured motorist coverage."[4] The trial court agreed, concluding that since the plaintiff did not fully perceive what coverage he was surrendering at the time he returned the tear sheet, he had not waived his statutorily mandated right to uninsured motorist coverage equal to the insurance policy's liability coverage. The trial court opined that "[i]nasmuch as the waiver question is a factual one, it is not subject to review by this court." The trial court then rendered judgment in accordance with the referee's report. The defendant appealed to the Appellate Court and we thereafter transferred the matter to ourselves pursuant to Practice Book § 4023.

[4] The referee relied extensively on our holding in *Travelers Indemnity Co.* v. *Malec,* 215 Conn. 399, 576 A.2d 485 (1990). In *Malec,* we concluded that the American Red Cross did not make a conscious decision to select a lesser amount of uninsured motorist coverage pursuant to General Statutes § 38-175 (c) because the insured's request predated the enactment of the enabling legislation by more than two years. Since the insured was unaware of the statute at the time of its request, we concluded that this did not constitute a request for a lesser amount pursuant to the statute. *Malec* is distinguishable from the present case where the plaintiff's response was the result of his carrier specifically informing him of the amendment to the statute and the options available to him.

The defendant claims that despite its aleatory nature, a contract of insurance is nonetheless fundamentally a contract. The defendant argues that the trial court has reformed the contract that unambiguously provided uninsured motorist coverage of $20,000 per person and $40,000 per accident because the policyholder was unilaterally mistaken as to what coverage he was surrendering when he requested the lesser amount of coverage. The defendant argues that reformation of a contract is not available when the mistake, if any, is unilateral and is not accompanied by fraud or inequitable conduct on the part of the other party. We agree.

The contractual nature of insurance and the commercial relationship between insurer and insured are not altered by any peculiarities of uninsured motorist coverage. "The relationship between the insured and the insurer clearly is *contractual* in nature, and we find nothing in [the uninsured motorist statute] that alters the traditionally commercial setting in which insurance policies are purchased. Our [uninsured motorist] statute creates no fiduciary obligations . . . . As offeror, [the carrier] had no contractual duty *voluntarily* to explain the terms of its offer or the advantages and disadvantages to procuring uninsured motorist coverage. . . . All that is required . . . for an effective rejection is a writing signed by the named insured." (Emphasis in original.) *Silver* v. *Slusher*, 770 P.2d 878, 883 (Okla. 1988), cert. denied, 493 U.S. 817, 110 S. Ct. 70, 107 L. Ed. 2d 37 (1989).

"Reformation is appropriate in cases of mutual mistake—that is where, in reducing to writing an agreement made or transaction entered into as intended by the parties thereto, through mistake, common to both parties, the written instrument fails to express the real agreement or transaction. 5 Pomeroy, Equity Jurisprudence (2d Ed.) § 2096; 53 C.J. p. 941; Amer. Law Insti-

tute Restatement, Contracts, Vol. 2, §§ 504, 505 . . . . [R]eformation is also available in equity when the instrument does not express the true intent of the parties owing to mistake of one party coupled with fraud, actual or constructive, or inequitable conduct on the part of the other. 5 Pomeroy, Equity Jurisprudence (2d Ed.) § 2097; 53 C.J. p. 949 . . . ." (Citations omitted.) *Home Owners' Loan Corporation* v. *Stevens,* 120 Conn. 6, 9–10, 179 A. 330 (1935). Here, there was neither claim nor proof of a mutual mistake, fraud or inequitable conduct on the part of either party.[5] Since none of these elements was present, application of the equitable principle of reformation was not proper.

The plaintiff argues, however, that reformation of the contract here is required since an insurance contract must be read to include provisions which the law requires be included. The plaintiff claims that the 1983 amendment to § 38-175c required that uninsured motorist coverage in automobile liability insurance contracts must thereafter be equal to the limits of liability coverage unless the insured requested a lesser amount in writing. The plaintiff argues that since his written request for a lesser amount was not a knowing one, the doctrine of waiver, in effect, voids his request for a lesser amount, thereby entitling him to uninsured motorist coverage equal to the $300,000 liability coverage found in this policy. We do not agree.

It is well settled that an insurance contract must be read to include provisions that the law requires be included and to exclude provisions that the law prohibits. See, e.g., *Nicolletta* v. *Nationwide Ins. Co.,* 211

---

[5] The referee did not conclude that the defendant's conduct was fraudulent or inequitable but that, as a matter of law, "[an] analysis of the case law construing Section 38-175c (a) (2) indicates that [the defendant] was required to provide [the plaintiff] with understandable information concerning his selection of uninsured motorist coverage so as to enable him to intelligently accept or reject the increased limits of coverage . . . ."

Conn. 640, 645–46, 560 A.2d 964 (1989). "Unless the agreement indicates otherwise, [an applicable] statute existing at the time an agreement is executed becomes a part of it and must be read into it just as if an express provision to that effect were inserted therein." *Hatcho Corporation* v. *Della Pietra,* 195 Conn. 18, 21, 485 A.2d 1285 (1985).

The amendment to § 38-175c directed that automobile insurance contracts should thereafter provide for equal amounts of liability and uninsured motorist coverage. A statute that establishes contractual rights, however, is equally capable of setting forth the manner in which those rights may be surrendered. In this instance, an insured could relinquish his entitlement to the larger amount of uninsured motorist coverage by "request[ing] in writing a lesser amount." This is exactly what the plaintiff did.

It is uncontroverted that the plaintiff read the defendant's notice explaining the 1983 changes to § 38-175c; that he selected one of five available uninsured motorist coverages offered on the tear sheet; that he indicated his preference by placing his initials next to the coverage selected; that he dated and signed the tear sheet; and that he mailed the same to the defendant. Despite this overwhelming evidence that the plaintiff completely and fully complied with the statute, the plaintiff argued, and the referee agreed, that there had not been a legally effective waiver because of the plaintiff's "lack of understanding of what the coverage provided" and that "the notice sent . . . did not in any way increase the [plaintiff's] understanding of the meaning of uninsured motorist coverage."

Although the word "waiver" nowhere appears in the statute, even if we assume, arguendo, that the waiver doctrine was applicable to the circumstances here, application of its principles would not support the plaintiff's position. "Waiver is the voluntary relinquishment

of a known right. It involves the idea of assent, and assent is an act of understanding. This presupposes that the person to be affected has knowledge of his rights, but does not wish to assert them. Intention to relinquish must appear, but acts and conduct . . . inconsistent with intention to terminate the contract are sufficient. *The rule is applicable that no one shall be permitted to deny that he intended the natural consequences of his acts and conduct."* (Emphasis added.) *MacKay* v. *Aetna Life Ins. Co.,* 118 Conn. 538, 547–48, 173 A. 783 (1934).

"In order to waive a claim of law it is not necessary . . . that a party be certain of the correctness of the claim and its legal efficacy. It is enough if he knows of the existence of the claim and of its reasonably possible efficacy." *Jenkins* v. *Indemnity Ins. Co.,* 152 Conn. 249, 257–58, 205 A.2d 780 (1964). The plaintiff knew that he was selecting less coverage than that to which he was entitled. The notice made it very clear that increased amounts of coverage were available at a higher premium and that an election to accept less would reduce both the amount of coverage and the policy premium.

"Under the [trial] court's theory, waiver of a claim of law could rarely, if ever, be established, since the [plaintiff] could always claim, as in effect [he] did here, that [he] knew nothing about, or at least did not fully understand [the insurance coverage he was declining]. . . . The conclusion that a party has waived a right is one of fact for the trier and not one which can be drawn by this court, unless, on the subordinate facts found, such a conclusion is required as a matter of law." Id., 258. We hold that such a conclusion is required here.

The judgment is reversed and the matter is remanded with direction to render judgment for the defendant.

In this opinion the other justices concurred.