LISA MACOMBER ET AL. *v.* TRAVELERS PROPERTY AND CASUALTY CORPORATION ET AL.
(SC 16647)

Borden, Norcott, Katz, Palmer and Zarella, Js.

Argued April 25—officially released September 3, 2002

*Ralph Stone*, pro hac vice, with whom, on the brief, was *John C. Matulis, Jr.*, for the appellants (plaintiffs).

*Thomas J. Groark, Jr.*, with whom, on the brief, were *Kevin J. O'Connor, Joseph S. Allerhand*, pro hac vice, *John A. Neuwirth*, pro hac vice, and *Jonathan Margolis*, pro hac vice, for the appellees (defendants).

*Opinion*

BORDEN, J. The plaintiffs, Lisa Macomber and Kathryn Huaman, the custodian for Joshua Adickes,[1] appeal[2] from the judgment of the trial court rendered in favor of the defendants, namely, Travelers Group, Inc. (Travelers Group), Travelers Property Casualty Corporation (Travelers Casualty), Travelers Equity Sales, Inc. (Travelers Equity), Travelers Life and Annuity Company (Travelers Annuity), and Salomon Smith Barney Holdings, Inc. (Smith Barney), following the granting of the defendants' motion to strike the plaintiffs' complaint.

---

[1] Although Macomber and Huaman brought this action as a class action on behalf of themselves and others similarly situated, the trial court has not yet been presented with the question of whether to certify the plaintiffs' action as a class action. The trial court will have to make that determination pursuant to the standards set forth in Practice Book §§ 9-7 and 9-8. We, therefore, refer to Macomber and Huaman as the plaintiffs.

[2] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the case to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The plaintiffs claim that the trial court improperly concluded that, regardless of the theory of liability offered by the plaintiffs, all counts of their complaint must fail because they did not sufficiently allege any legally cognizable damages. We agree with the plaintiffs. The defendants, however, offer alternate grounds for striking each count of the complaint. After an examination of the defendants' alternate grounds, we affirm in part, and reverse in part, the judgment of the trial court.

The plaintiffs brought this action, in ten substantive counts,[3] based on the defendants' conduct in entering into and funding certain structured settlements to settle claims with the plaintiffs. The defendants moved to strike all counts for the plaintiffs' failure to allege any legally cognizable injury. The trial court granted the motion and rendered judgment accordingly.

The plaintiffs' complaint alleged the following facts. Travelers Group is a diversified financial services holding company that conducts business in, among other areas, property and casualty insurance services. Travelers Group conducts these operations primarily through Travelers Casualty, which was formed in 1996 to hold the property and casualty subdivisions of the Travelers Insurance Group, Inc., an indirect wholly owned subsidiary of Travelers Group. Travelers Group owns approximately 83 percent of Travelers Casualty outstanding common stock. Travelers Group is also the corporate parent of, and controls, wholly owned subsidiaries

[3] The plaintiffs also requested that the trial court order an accounting of all moneys that allegedly were wrongfully obtained by the defendants in purchasing the structured settlements on the plaintiffs' behalf, and impose a constructive trust over such moneys. Although the plaintiffs framed these requests as counts eleven and twelve of their complaint, these are issues to be addressed by the trial court upon remand because, rather than being substantive causes of action upon which the complaint is predicated, these counts request remedies, the appropriateness of which would be left to the discretion of the trial court if the plaintiffs, or either of them, were to prevail at trial.

Smith Barney and Travelers Equity. Smith Barney and Travelers Equity act as brokers for Travelers Casualty in effectuating the purchase of annuities by Travelers Casualty. Smith Barney conducts these brokerage activities through its subsidiary SBHU Life Agency of Ohio, Inc. (SBHU) Among the life insurance agencies that Travelers Equity and Smith Barney deal with is Travelers Annuity, another wholly owned subsidiary of Travelers Group.

The plaintiffs' complaint alleged, further, that, in accordance with industry practice, Travelers Casualty routinely utilizes structured settlements[4] to resolve various types of claims. Once a claimant and Travelers Casualty agree on a structured settlement, Travelers Casualty enlists the aid of an insurance broker, whose job it is to arrange the purchase, from a life insurance company, of an annuity by Travelers Casualty that meets the terms previously agreed upon by the claimant and Travelers Casualty. After Travelers Casualty has purchased the annuity, the life insurance company pays a commission to the insurance broker.

The plaintiffs further alleged that Travelers Casualty deals primarily with those insurance brokers with whom it either has an affiliation or some sort of other special relationship. The brokers then pay Travelers Casualty between 25 percent and 75 percent of the commissions that they receive from the life insurance companies that sell annuities to Travelers Casualty. The plaintiffs claimed, specifically, that during the period between 1982 and 1994, Travelers Casualty employed its then affiliate, Travelers Equity, as its insurance broker. Travelers Equity, in turn, arranged for Travelers Casu-

---

[4] "A structured settlement is a release of personal injury or sickness claims in exchange for the promise by the defendant to make one or more future payments to the plaintiff. The payments are normally funded using an annuity or obligations of the United States." 3 J. Stein, Personal Injury Damages (3d Ed. 1997) § 16:1, p. 16-6.

alty to purchase its annuities from Travelers Annuity. Travelers Equity returned to Travelers Casualty between 25 percent and 75 percent of the commissions that it received from Travelers Annuity or any other life insurance company. Beginning in January, 1994, Travelers Casualty also entered into an exclusive arrangement with Smith Barney, whereby Travelers Casualty agreed to purchase all of its annuities through SBHU. SBHU would arrange annuity purchases by Travelers Casualty from various life insurance companies, receiving commissions from those companies in return. Smith Barney, after receiving the commissions from SBHU, would pay Travelers Casualty 50 percent of the gross commission. In January, 1998, Travelers Casualty entered into a similar arrangement with Ringler Associates, and with Wells and Associates, both of whom are not parties to this action. Pursuant to this arrangement, the brokers agreed to "place a significant portion of their [nonTravelers Casualty] generated premiums with [Travelers Annuity]" and give 50 percent of their annuity commissions to Travelers Casualty. In the remainder of this opinion, we refer to this transfer of a portion of the commissions from the brokers to Travelers Casualty as the "rebating scheme."

In addition to the rebating scheme, the plaintiffs alleged that Travelers Casualty frequently spends less on its purchase of annuities than the amounts that its agreements with claimants call for, by overstating the present net worth of the annuities. Hereafter, we will refer to this course of conduct as the "short-changing scheme."

The plaintiffs further alleged that Travelers Casualty "regularly and routinely solicits the sale of life insurance products" without a license to do so. The plaintiffs contend, specifically, that the Travelers Casualty claim adjusters, through their training, sales presentation, and use of " 'Quote Partner' " software, which converts a

settlement amount into an annuity, "provide expertise life insurance interpretations and guidance concerning annuity valuations and the purported advantages and disadvantages of having annuities," and attempt to convince claimants, whose settlements exceeded certain amounts, to receive their settlements in the form of annuities.

Given this factual background, as alleged in general, we now turn to the specific allegations of the two plaintiffs. In 1988, Macomber was involved in an automobile accident. Thereafter, she settled her claim against the alleged tortfeasors, who were insured by Travelers Casualty, for $85,000. Under the terms of the settlement, Travelers Casualty agreed to pay the plaintiff $70,000 and to purchase an annuity "with an estimated present value" of $15,000. This annuity was to provide Macomber with an income stream of $1015.18 annually, with thirty payments guaranteed. Macomber's attorneys' fees were calculated using a total settlement value of $85,000. The plaintiffs alleged however, that Travelers Casualty spent materially less than $15,000 for Macomber's structured settlement because Travelers Casualty "received undisclosed rebates in connection with the purchase of the annuity used to fund the structured settlement."

Huaman, acting as the guardian of a minor child who also was involved in an automobile accident, entered into a similar structured settlement with Travelers Casualty. Travelers Casualty settled her claim for the full policy amount, namely, $10,000, of which Huaman would pay $3333 in attorneys' fees, and Travelers Casualty would purchase an annuity for Huaman's ward "that was represented to be of a value and cost of $6667 . . . ." This structured settlement was to provide her with payments of: $2500 on January 21, 2005; $3000 on January 21, 2006; $3500 on January 21, 2007; and $5000 on January 21, 2008. The plaintiffs alleged that Travelers

Casualty, as it did when purchasing Macomber's annuity, spent materially less than $6667 to purchase the annuity because "it received undisclosed rebates in connection with the purchase of the annuity used to fund the structured settlement." The plaintiffs also alleged that, even before receiving any rebate, Travelers Casualty paid Travelers Annuity $6569.51, not $6667, for the previously described structured settlement.

Contending that the defendants' rebating and short-changing schemes were illegal, the plaintiffs brought this ten count complaint. The plaintiffs alleged that they had entered into structured settlements with the defendants "under materially false and misleading circumstances because [the] defendants misrepresented the fundamental nature and terms of the structured settlements" by failing to disclose the actual cost and true value of the structured settlements to the plaintiffs after taking into account the rebating and short-changing schemes. The plaintiffs specifically alleged that, had the defendants disclosed these practices, they would not have agreed to the structured settlements as configured, but would have negotiated for higher settlement amounts.

The plaintiffs complaint sounded in the following nine counts against all of the defendants alleging: (1) breach of the implied duty of good faith and fair dealing; (2) breach of fiduciary duty; (3) violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.; (4) violation of the Connecticut Unfair Insurance Practices Act (CUIPA), General Statutes § 38a-316; (5) fraud; (6) negligent misrepresentation; (7) civil conspiracy; (8) conversion; and (9) unjust enrichment. Additionally, a tenth count sounded against Travelers Casualty only, alleging breach of contract. The defendants moved to strike the plaintiffs' complaint in its entirety, arguing that the plaintiffs had failed to assert a legally cognizable injury. The trial

court granted the defendants' motion, concluding that "[e]ach of the counts of the [c]omplaint must fail because, regardless of how the plaintiffs choose to characterize the defendants' conduct, they have not asserted that they suffered any damage because they received the exact amounts which they agreed to and expected to receive under the structured settlement agreements. . . . [T]he suffering of some damage by the plaintiffs is a necessary element of all causes of action alleged in the [c]omplaint." The plaintiffs did not amend their complaint, and the trial court rendered judgment for the defendants striking the complaint. This appeal followed.

## I

The first issue that we must decide is whether the trial court improperly concluded that the plaintiffs did not allege any redressable harm. The plaintiffs contend that the trial court improperly struck their complaint because it focused only on the income stream that the plaintiffs had negotiated to receive and had failed to consider that the payment plan that the plaintiffs had agreed to "was induced by a representation as to its cost, and that the cost was not accurately reported to the plaintiffs in good faith." We agree.

We note first that, in deciding this appeal, we consider only whether the trial court properly determined that the plaintiffs had failed to allege any cognizable damages. Therefore, we do not consider, for example, whether the plaintiffs can prove that in fact they had been harmed. In other words, we do not consider whether the defendant in fact had made any misrepresentations as to the cost of the annuity; whether, but for such misrepresentation, the plaintiffs would not have accepted the settlements; and whether, as a result of the alleged misrepresentations, the plaintiffs have

received an annuity with a reduced value and a reduced income stream resulting therefrom.

"Before addressing the merits of the [plaintiffs'] claim, we set forth the standard of review applicable to an appeal challenging the trial court's granting of a motion to strike. A motion to strike challenges the legal sufficiency of a pleading, and, consequently, requires no factual findings by the trial court. As a result, our review of the court's ruling is plenary. . . . We take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . Thus, [i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied." (Citations omitted; internal quotation marks omitted.) *Vacco* v. *Microsoft Corp.*, 260 Conn. 59, 64–65, 793 A.2d 1048 (2002). Thus, we assume the truth of both the specific factual allegations and any facts fairly provable thereunder. In doing so, moreover, we read the allegations broadly, rather than narrowly. *Parsons* v. *United Technologies Corp.*, 243 Conn. 66, 83, 700 A.2d 655 (1997).

Applying this broad, flexible, and permissive standard to the plaintiffs' complaint, we conclude that the complaint sufficiently alleged a legally cognizable loss. Specifically, the complaint, broadly construed, would, as the plaintiffs suggested in oral argument before this court, permit proof that, had the true facts been as the defendants represented them to be, the plaintiffs would have been able to negotiate structured settlements that: (1) cost *and* were therefore *worth*, more than were in fact negotiated; and (2) would have produced income streams greater than were in fact negotiated. In addition, the complaint would also permit proof that, as a result of the defendants' alleged misrepresentation of both the cost and value of the structured settlements, the plaintiffs paid their attorneys more than they would

have, had they known the true cost and value of their annuities.

Construing the plaintiffs' complaint in the most favorable light, we read the allegations contained therein as permitting proof of the following facts. The first step in the settlement negotiations between Travelers Casualty and each of the plaintiffs was to agree upon a gross amount by which to satisfy their respective claims. Second, the plaintiffs agreed to have those amounts paid out to them in the form of structured settlements. As part of the structured settlements, both plaintiffs agreed to have portions of the amounts owed them invested in annuities. In entering into these agreements, the plaintiffs believed, based upon Travelers Casualty's representations, that the amount that Travelers Casualty would spend to purchase their annuities—in other words, the "cost" of the annuity to Travelers Casualty— was the same amount that the plaintiffs agreed to have Travelers Casualty place in an annuity for them.

For example, when Huaman settled with Travelers Casualty, she first obtained an agreement that Travelers Casualty would contribute the full policy amount to the settlement, namely, $10,000. Huaman then calculated her attorneys' fees, totaling $3333, which were contingent upon the total settlement. With the amount remaining, $6667, Huaman accepted a structured settlement in the form of an annuity, as alleged by Huaman, "that was represented to be of a *value and cost* of $6667"; (emphasis added); which would provide her with four annual payments, beginning on January 21, 2005, totaling $14,000.

Similarly, after Macomber agreed to settle her claim for $85,000—the amount from which she calculated her attorneys' fees—she agreed to accept $70,000 in cash and to have Travelers Casualty fund an annuity "with

an estimated present value" of $15,000,[5] which would provide an income stream of $1015.18 annually for a minimum of thirty years.

Thus, based on these allegations, when Huaman contemplated settling her claim for $10,000, it is reasonable to infer that, as an alternative to the structured settlement, Travelers Casualty would have given her $10,000 in cash,[6] from which she would have paid her attorneys their contingency fee of $3333. Had Huaman chosen to purchase an annuity, she would have had $6667 with which to purchase the most favorable annuity she could procure for that amount. When Huaman instead agreed to have Travelers Casualty purchase an annuity on her behalf, she believed, based on Travelers Casualty's representations, that it would spend the same $6667 that

---

[5] Unlike the allegations involving Huaman, the plaintiffs do not seem to allege specifically in their complaint that Travelers Casualty made a representation that cost equaled value in settling Macomber's claim. In its memorandum of decision, however, the trial court interpreted the allegations as implying that "Macomber entered into a structured settlement with [Travelers Casualty] with a present value and cost of $15,000." In their brief to this court, the defendants adopt this language in their statement of facts without qualification. Therefore, for purposes of this appeal, we also adopt the trial court's interpretation.

[6] The plaintiffs do not allege that Travelers Casualty offered them the option of receiving their settlements in cash. In fact, at oral argument before this court, the plaintiffs specifically pointed out that Travelers Casualty effectively presented the structured settlement as the only alternative to continuing litigation. The plaintiffs further noted that most plaintiffs, if offered the option, would elect to receive a settlement in cash. The defendants, to the contrary, represented to this court that the plaintiffs could have received a cash settlement had they requested it. Given these conflicting representations, we will assume that, had the plaintiffs explored the possibility of receiving their settlements in cash, the defendants would have been amenable. This assumption appears consistent with the plaintiffs' contention that cost is synonymous with present value, because, if the defendants were willing to make the representation that the cost of an annuity was its present value, they likely would be willing also to offer the option of providing a cash settlement rather than a structured settlement.

she would have had to procure an annuity.[7] Macomber was under a similar belief. Having first agreed to settle her claim with Travelers Casualty for $85,000, Macomber later consented to having $15,000 invested in a structured settlement. Based on Travelers Casualty's representations, she believed that the annuity purchased by Travelers Casualty would cost it the same $15,000 that she could have invested herself had she chosen to receive cash rather than a structured settlement.

It is against this factual background that we evaluate the plaintiffs' claim. Critical to their theory of harm, under either the rebating or short-changing scheme,[8] is their allegation that the "present value" of each of their annuities was represented to be the same as the "cost" of the annuity.[9] In the case of Huaman, she alleged that she "accepted a structured settlement that was represented to be of a value and cost of $6667." In Macomber's case, she alleged that Travelers Casualty

---

[7] The plaintiffs make no claim that Travelers Casualty would have purchased an annuity as favorable to Huaman as one that she herself could have purchased, only that Travelers Casualty would spend $6667 on it.

[8] We note that the allegations concerning Macomber's settlement involve only the rebating scheme, whereas Huaman's allegations encompass both the rebating and short-changing schemes. Because, as we detail in this opinion, the plaintiffs may be able to prove harm under either theory, we need not analyze the defendants' motion separately for each plaintiff.

[9] We recognize that ordinarily the present value of an annuity is not necessarily equal to the actual cost of that annuity. "The present value of a structured settlement is a function of the discount rate selected to reduce the future payments to a value in today's dollars. The lower the discount rate, the higher the present value of the stream of periodic payments. . . .

"The 'actual cost' of an annuity is the amount of money the insurance carrier must actually spend to purchase the annuity to make the structured payments. This figure represents the true value of the settlement. Thus, the actual cost of the annuity may not be the same as the present value of the annuity." 3 J. Stein, Personal Injury Damages (3d Ed. 1997) § 16:5, p. 16-11. For purposes of this appeal, however, we must accept as true the plaintiffs' allegation that the defendants represented and agreed that the cost of their annuity would be equal to its present value.

executed a release "which represented that consideration for [Macomber's] release included 'a structured settlement in accordance with Exhibit A with an estimated present value of [$15,000].' " The plaintiffs alleged that these representations meant that the annuities would cost Travelers Casualty $6667 and $15,000, respectively.

There is authority to support the plaintiffs' factual allegations in this regard. See, e.g., *Old Republic Ins. Co.* v. *Ashley*, 722 S.W.2d 55, 58 (Ky. App. 1986) ("[t]he prevailing law is that a structured settlement should be valued at its present cash value"); *Bonarek* v. *Wayne County Board of Institutions*, 165 Mich. App. 346, 354, 419 N.W.2d 21 (1987) ("[t]he cost of the annuities are their present values"); *Merendino* v. *FMC Corp.*, 181 N.J. Super. 503, 509, 438 A.2d 365 (1981) ("the cost of the annuities reflects the actual present value in the marketplace"); 3 J. Stein, Personal Injury Damages (3d Ed. 1997) § 16:40, p. 16-40 ("[c]ourts have consistently held that the present value of an annuity used to fund a structured settlement is its cost"). Whether the terms "cost" and "present value" were represented to be synonymous is a question of fact to be resolved at trial. For purposes of this appeal, however, we must accept the plaintiffs' equation as accurate.

Given the foregoing, we conclude that the plaintiffs may be able to demonstrate that they were harmed in two ways. First, as set forth in the complaint, the plaintiffs alleged that: (1) Travelers Casualty represented that it would provide annuities of a certain cost and value, specifically, $6667 for Huaman's and $15,000 for Macomber's; (2) these annuities actually cost Travelers Casualty less than those amounts; (3) had the plaintiffs known of Travelers Casualty's practices, namely, its rebating and short-changing schemes, they could have negotiated for annuities that *actually cost and had* a present value of $6667 and $15,000 respectively; and (4)

as a result, they would have received a greater income stream than they in fact did. Thus, the plaintiffs have alleged two harms: a reduced value to their annuity; and a reduced income stream resulting therefrom. Furthermore, in the event that the plaintiffs prove these allegations at trial, we cannot rule out, at this stage, that the trial court, in its discretion, would impose a constructive trust, for the benefit of the plaintiffs, for the difference between the two amounts—namely, the represented cost of the annuity, and the actual cost thereof, or some other type of compensatory relief.

Second, the plaintiffs alleged that they calculated their attorneys' fees based on the total settlement amount. If Travelers Casualty allegedly spent a lesser amount on the annuity than it had agreed to spend, and if we accept as true, as we must, the plaintiffs' assertion that the value of the annuity was represented to equal its cost, then the attorneys' fees were calculated incorrectly, depriving the plaintiffs of a portion of their settlement. For example, in the case of Huaman, assuming that the plaintiffs can prove their short-changing allegation, Travelers Casualty, although agreeing to spend $6667 on an annuity, actually purchased an annuity costing $6569.51. Thus, instead of spending $10,000 on Huaman's settlement as was promised, Travelers Casualty actually spent $9902.51. Based on this sum, Huaman's attorneys' fees would have been $3300, rather than the $3333 that was paid. In addition, under the plaintiffs' rebating allegations, Huaman overpaid her attorneys by an even greater amount.

The defendants contend, nonetheless, as the trial court determined, that the plaintiffs cannot "allege any legally cognizable injury" because, first, with respect to the rebating allegations, the plaintiffs do not, and cannot, allege how or why they are entitled to any portion of the annuity commission paid by the insurance brokers to Travelers Casualty. The defendants argue

that the plaintiffs have received exactly what they bargained for, namely, an annuity that provided the plaintiffs with an agreed upon income stream.[10] The defendants further argue that, because the commission paid by the life insurance company to the broker was both legal[11] and not part of the payments promised to the plaintiffs, it was the *"brokers* money to do with as it pleased. . . . The fact that the broker later used a portion of that commission allegedly to pay others who provided it with services—whether its lawyers, its accountants or the insurance company whose claims representatives did the leg work in arranging the structure and securing the annuity—does not suddenly make the plaintiffs' decade-old structured settlements the products of a fraud." (Emphasis in original.) We disagree.

The plaintiffs alleged that Travelers Casualty promised to spend a certain amount to purchase an annuity. The plaintiffs further alleged that, by ultimately receiving a portion of the broker's commission in the form of a rebate, Travelers Casualty failed to do as promised. The key to the plaintiffs' argument is that, once Travelers Casualty made a representation as to how much the annuity would cost for it to purchase, Travelers Casualty had a duty to disclose any rebates or other schemes that would reduce the final cost of the annuity to Travelers Casualty.

We have held that "[a] failure to disclose can be deceptive only if, in light of all the circumstances, there

---

[10] The plaintiffs do not allege that they have not received any payments called for in the settlement agreement.

[11] We note that the plaintiffs alleged that these commission agreements violated both Connecticut and New York law. See General Statutes § 38a-825; N.Y. Ins. Law § 2324 (McKinney 2000). Neither party has briefed in sufficient detail whether these payments by the brokers were legal or illegal, or whether, if illegal, the plaintiffs can benefit by such a determination. Therefore, we leave this allegation for future proceedings in the trial court, where it may be argued in sufficient detail.

is a duty to disclose." (Internal quotation marks omitted.) *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 180, 757 A.2d 14 (2000). "Regarding the duty to disclose, the general rule is that . . . silence . . . cannot give rise to an action . . . to set aside the transaction as fraudulent. Certainly this is true as to all facts which are open to discovery upon reasonable inquiry." (Internal quotation marks omitted.) *Duksa* v. *Middletown*, 173 Conn. 124, 127, 376 A.2d 1099 (1977). A duty to disclose will be imposed, however, "on a party insofar as he voluntarily makes disclosure. A party who assumes to speak must make a full and fair disclosure as to the matters about which he assumes to speak." (Internal quotation marks omitted.) Id. Based on the plaintiffs' allegations that Travelers Casualty made affirmative misrepresentations as to the cost of the annuities, we conclude that, whether Travelers Casualty had a duty to disclose its agreements with various annuity brokers so that the plaintiffs could make an informed decision regarding whether to accept Travelers Casualty's annuity offer, and if so, whether it violated that duty, are questions of mixed fact and law that would require a more detailed factual matrix than is disclosed by the plaintiffs' allegations. Because such a factual basis is not present, these questions cannot be answered satisfactorily on this motion to strike. Although we agree with the trial court that, as a general proposition, an insurer has no duty to disclose its actual cost in purchasing an annuity, in this case, given the plaintiffs' allegations, such a duty may have arisen. Suffice it to say that the allegations are sufficient to withstand the defendants' motion to strike.

Turning to the short-changing allegations, the defendants contend that the plaintiffs "cannot demonstrate how [Travelers Casualty's] alleged reduced 'cost' in purchasing annuities somehow translates into additional value that [the] plaintiffs should have received in their

settlements." In other words, the defendants assert, because the plaintiffs still will receive the same income stream to which they previously agreed, they have not been harmed. This argument fails to acknowledge, however, that the plaintiffs have alleged that Travelers Casualty agreed to do *two* things: (1) purchase an annuity that would provide designated periodic payments; and (2) spend an agreed upon amount to purchase that annuity. Consequently, even if Travelers Casualty is making the agreed upon payments, it still has breached its agreement with the plaintiffs to spend a certain amount on the annuity. As explained previously, under this scenario, the plaintiffs may be entitled to damages calculated on the basis of a larger annuity, in both cost and income stream, and to the amount that the plaintiffs spent in excess attorneys' fees.

## II

Although we have determined that the plaintiffs' allegations can be read so as properly to state a claim for relief, the defendants have asserted alternate grounds of affirming the motion to strike as to each count. We turn, therefore, to an examination of each of the defendants' alternate grounds.

## A

### Count One

In count one of their complaint, the plaintiffs asserted that they enjoyed a contractual relationship with the defendants that gave rise to a duty of good faith and fair dealing. The plaintiffs further asserted that the defendants, in engaging in the conduct that we previously have described, breached that duty. Upon reviewing the entire complaint, however, we conclude that the plaintiffs have failed to plead sufficient facts to support this cause of action.

"It is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. See *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 566, 479 A.2d 781 (1984); see also 2 Restatement (Second), Contracts § 205 (1979) ('[e]very contract imposes upon each party a duty of good faith and fair dealing *in its performance and its enforcement*'). 'The covenant of good faith and fair dealing *presupposes that the terms and purpose of the contract are agreed upon* by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term.' *Neiditz* v. *Housing Authority*, 43 Conn. Sup. 283, 294, 654 A.2d 812 (1994), aff'd, 231 Conn. 598, 651 A.2d 1295 (1995). In accordance with these authorities, *the existence of a contract between the parties is a necessary antecedent to any claim of breach of the duty of good faith and fair dealing.*" (Emphasis added.) *Hoskins* v. *Titan Value Equities Group, Inc.*, 252 Conn. 789, 793, 749 A.2d 1144 (2000).

As our case law makes clear, no claim for breach of the duty of good faith and fair dealing will lie for conduct occurring prior to, or during, the formation of a contract. In the present case, the plaintiffs repeatedly alleged that the defendants made material misrepresentations and omissions of fact regarding the structured settlements *that induced them to enter into the agreements* at issue. Because the challenged conduct underlying the plaintiffs' complaint thus took place at the negotiation and execution stage, rather than at the performance stage of their contracts, the defendants owed the plaintiffs no duty of good faith and fair dealing. In the absence of any other identifiable conduct that occurred subsequent to the contracts' formation and arose independent of the defendants' initial misrepresentations, we conclude that the plaintiffs have alleged insufficient facts upon which to base a claim for breach

of the duty of good faith and fair dealing. Accordingly, count one of the plaintiffs' complaint should be stricken.

## B

## Count Two

Count two asserted that the defendants owed the plaintiffs a fiduciary duty, which they breached by virtue of the conduct described throughout the complaint.[12] The defendants argue, to the contrary, that the

[12] The plaintiffs alleged, specifically, that the defendants acted as the plaintiffs' agents at all times relevant to the settlement of their claims and, as such, owed them a fiduciary duty. We disagree with the plaintiffs' characterization of their relationship with the defendants, and thus look for some other basis upon which to ground their claim for breach of a fiduciary duty.

Although agency is normally a question of fact, its existence or nonexistence may be determined as a matter of law. See *Hallas* v. *Boehmke & Dobosz, Inc.*, 239 Conn. 658, 674, 686 A.2d 491 (1997). "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall *act on his behalf and subject to his control, and consent by the other so to act.*" (Emphasis added.) 1 Restatement (Second), Agency § 1, p. 7 (1958). Although it may be argued that, in procuring the annuities to fund the plaintiffs' structured settlements, the defendants were acting on their behalf, one cannot overlook the salient fact that the defendants were also acting primarily for their own benefit and that of their insureds. The plaintiffs' complaint, moreover, fails to allege that the defendants affirmatively consented to act in their best interests in purchasing the annuities. It therefore follows that the defendants did not owe the plaintiffs the single duty of loyalty characteristic of the relationship that exists between a principal and his agent. Furthermore, noticeably absent from the facts alleged in the complaint is any indicia that the defendants acted subject to the plaintiffs' control. After negotiating at arm's length to reach a settlement, the plaintiffs agreed to accept, and the defendants agreed to provide, part of the total settlement amount in the form of an annuity. Once such an agreement had been reached, the parties' rights and responsibilities were defined by the terms of the settlements alone. Thereunder, the defendants undertook a contractual obligation only to purchase the annuities at a certain cost and with a certain value; the plaintiffs, more importantly, retained no authority over the manner in which the annuities would be procured. Thus, the plaintiffs had no say regarding the type of annuity that would be used to fund their settlements; who would supply the annuity; or the terms under which the annuity was purchased. Indeed, had the plaintiffs been invested with the type of control inherent in the traditional principal-agent relationship, they would have been able to monitor the defendants'

"[p]laintiffs make no allegations . . . that conceivably could give rise to a fiduciary relationship . . . much less any breach thereof." We agree with the defendants.

"It is well settled that 'a fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other.' . . . *Konover Development Corp.* v. *Zeller,* [228 Conn. 206, 219, 635 A.2d 798 (1994)]; *Dunham* v. *Dunham,* 204 Conn. 303, 322, 528 A.2d 1123 (1987); *Alaimo* v. *Royer,* 188 Conn. 36, 41, 448 A.2d 207 (1982); *Harper* v. *Adametz,* 142 Conn. 218, 225, 113 A.2d 136 (1955). Although this court has 'refrained from defining a fiduciary relationship in precise detail and in such a manner as to exclude new situations'; *Harper* v. *Adametz,* supra, 225; we have recognized that not all business relationships implicate the duty of a fiduciary. *Hemingway* v. *Coleman,* 49 Conn. 390, 391 (1881). In particular instances, certain relationships, as a matter of law, do not impose upon either party the duty of a fiduciary." *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.,* 255 Conn. 20, 38, 761 A.2d 1268 (2000).

Even when construed in a light most favorable to the plaintiffs, the complaint in the present case alleged no more than that the plaintiffs enjoyed a contractual relationship with the defendants, whereby the defendants agreed to procure an annuity at a certain cost and worth a certain value in order to fund the plaintiffs' structured settlements. Although this relationship imposed upon the defendants a duty to act in accordance with the

conduct and, perhaps, would have been better equipped to safeguard their interests against the rebating and short-changing schemes alleged in the present complaint. Because these elements, critical to the existence of an agency relationship, are lacking on the face of the plaintiffs' complaint, we conclude that no such relationship existed that could have given rise to a fiduciary duty.

terms of the settlements, it was not marked by the "unique degree of trust and confidence" typically characteristic of a fiduciary relationship. Id. For example, the defendants had no discretion to invest the plaintiffs' settlement money in such a way as to produce the highest possible income stream for their benefit. If they had, the plaintiffs would have relied solely on the defendants' superior investment knowledge and expertise to make prudent choices on their behalf in order to attain the greatest value for their money. Because such a scenario would have many of the hallmarks traditionally associated with a fiduciary relationship, it would be more likely to form the basis for a claim of breach of fiduciary duty than the actual facts in the present case, where the defendants assumed only a contractual obligation to procure annuities at a certain cost and value as part of the plaintiffs' settlements. See id., 40–42 (no fiduciary obligation exists where parties contract at arm's length).

Our conclusion that the defendants did not act in a fiduciary capacity in purchasing the annuities at issue is further supported by the fact that, in settling the plaintiffs' claims, the defendants were acting on behalf of *their* insureds. Jurisdictions are split on the issue of whether an insurer owes a fiduciary duty to its insured; our case law is silent on this issue except for a single pronouncement in *Harlach* v. *Metropolitan Property & Liability Ins. Co.*, 221 Conn. 185, 190, 602 A.2d 1007 (1992), where we characterized the relationship between the insurer and insured as "commercial," at least in the context of purchasing a policy. It thus follows that, if an insurer owes no fiduciary duty to its insured, whose interest it is safeguarding in settling a claim, a fortiori, it owes no such duty to a third party claimant. Even if we were to assume, however, that the insurer does act in a fiduciary capacity with respect to its insured, that fact precludes an inference of a fidu-

ciary duty existing between the insurer and a third party claimant because, such a duty would interfere with the insurer's ability to act primarily for the benefit of *its* insured.

Finally, our conclusion regarding the nature of the relationship that existed between the plaintiffs and defendants in this case is supported by case law from other jurisdictions. See, e.g., *Putnam Resources* v. *Pateman*, 958 F.2d 448 (1st Cir. 1992) (insured's representative does not owe fiduciary duty to third party plaintiff); *Morta* v. *Korea Ins. Corp.*, 840 F.2d 1452 (9th Cir. 1988) (no confidential or trust relationship giving rise to duty between plaintiff and adverse party's insurer).

## C

### Count Three

Count three of the plaintiffs' complaint alleged that Travelers Casualty "breached the contracts and terms" of their respective settlements by failing to pay the plaintiffs certain agreed upon amounts. On appeal, the defendants reassert their earlier contention that "the absence of any allegations as to how the plaintiffs were injured or damaged defeats" the breach of contract claim. As was discussed in part I of this opinion, however, the plaintiffs have articulated a theory of harm that, if proven at trial, will entitle them to damages. We need not discuss that theory further.

## D

### Count Four

Count four of the plaintiffs' complaint asserted that, based on the allegations contained therein, the defendants have violated CUTPA by "[using] and [employing] unfair and deceptive acts and practices in connection with the solicitation and entering into of structured settlements in connection with the sale of annuities."

The defendants argue that this count should be stricken because: (1) no consumer relationship existed between the defendants and the plaintiffs; and (2) the claim was not pleaded with sufficient particularity. We disagree.

Turning first to the issue of a consumer relationship, "[w]e previously have stated in no uncertain terms that CUTPA imposes no requirement of a consumer relationship. In *McLaughlin Ford, Inc.* v. *Ford Motor Co.*, 192 Conn. 558, 473 A.2d 1185 (1984), we concluded that CUTPA is not limited to conduct involving consumer injury and that a competitor or other business person can maintain a CUTPA cause of action without showing consumer injury." (Internal quotation marks omitted.) *Fink* v. *Golenbock*, 238 Conn. 183, 215, 680 A.2d 1243 (1996). Despite this pronouncement, the defendants cite to language quoted in *Jackson* v. *R. G. Whipple, Inc.*, 225 Conn. 705, 727, 627 A.2d 374 (1993), that " 'a claimant under CUTPA must possess at least some type of consumer relationship with the party who allegedly caused harm to him or to her.' " We clarified this language, however, in *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 495–96, 656 A.2d 1009 (1995), stating: "Although we acknowledge the presence of dicta in *Jackson* pertaining to consumer relationships, our holding in that case was merely that allowing a plaintiff to sue her opponent's attorney under CUTPA would infringe on the attorney-client relationship." We then went on to reaffirm our position that a consumer relationship is not a prerequisite to having standing to assert a CUTPA violation. Id., 496. Accordingly, we reject the defendants' contention that a consumer relationship is a prerequisite for maintaining a CUTPA cause of action.

The defendants claim, alternatively, that the CUPTA count was not pleaded with sufficient particularity. They argue, specifically, that the plaintiffs' allegation that the " '[d]efendants used and employed unfair and deceptive acts and practices in connection with the

solicitation and entering into of structured settlements in connection with the sale of annuities' " was insufficient for this court to evaluate the legal theory behind this claim. We disagree.

"[I]n determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of [a violation of CUTPA]." (Internal quotation marks omitted.) *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, 250 Conn. 334, 367–68, 736 A.2d 824 (1999). The defendants make no claim that the plaintiffs' allegations, if taken as true, fail to satisfy this test. Rather, the defendants suggest that, because the plaintiffs, in count four of their complaint, did not rephrase their pleadings to conform to the three prongs of the cigarette rule, we should consider their CUTPA cause of action as factually unsupportable.[13] We are unpersuaded that there is any special requirement of pleading particularity connected with a CUTPA claim, over and above any other claim. We, therefore, reject this contention of the defendants.

---

[13] The defendants cite *Butler* v. *Bankers & Shippers Ins. Co.*, Superior Court, judicial district of Waterbury, Docket No. CV960131722 (January 8, 1998), seemingly as support for this proposition. In that case, however, the trial court dismissed the CUPTA count because the plaintiffs' complaint contained no factual allegations in support thereof.

## E

### Count Five

In count five, the plaintiffs alleged that the defendants committed unfair and deceptive acts and practices in the solicitation of and sale of annuities under CUIPA. In their complaint, the plaintiffs pleaded their CUIPA allegation as a stand alone claim. In their brief to this court, however, the plaintiffs state: "Under Connecticut law, violations of CUIPA are enforced through claims under [CUTPA]. Indeed, [General Statutes] § 42-110g (a) of CUTPA affords a cause of action to '[a]ny person who suffers any ascertainable loss of money or property . . . as a result of the use or employment of a method, act or practice prohibited by section 42-110b' . . . including a violation of [CUIPA]." (Emphasis in original.) Given this statement, we read count five of the plaintiffs' complaint as an allegation that the defendants have violated CUTPA by committing a violation of CUIPA.[14] On remand, therefore, the plaintiffs may assert a CUTPA violation based on CUIPA.

## F

### Counts Six and Seven

Count six of the plaintiffs' complaint sets forth a cause of action for common-law fraud and count seven for negligent misrepresentation. The defendants argue that the plaintiffs have not alleged any facts in support of these claims because they have not articulated: (1) how they were materially misled by the defendants' alleged statements regarding the cost of the annuities; and (2) how those purported misstatements caused them harm. We disagree.

---

[14] As an alternate ground to strike count five of the plaintiffs' complaint, the defendants assert that CUIPA does not provide for a private cause of action. Because we read the plaintiffs' CUIPA count as a vehicle through which to bring a CUTPA claim, rather than as a stand alone claim, we need not address this issue.

As previously stated in part I of this opinion, at the beginning of the settlement process, the plaintiffs were faced, at least in theory, with a choice: take the agreed upon settlement amount in cash; or allow the defendants to use a portion of the total settlement amount to buy an annuity, which would provide the plaintiffs with a set income stream. Based upon the defendants' representations that they would procure an annuity at a certain cost and worth a certain amount, the plaintiffs agreed to accept the income stream rather than ask for cash. According to the plaintiffs' complaint, however, the defendants then spent materially less than promised on their annuities as a result of their rebating and short-changing schemes. Even if we were to assume, as the plaintiffs contend, that the cost of an annuity is the equivalent of its value, the plaintiffs were left with annuities worth less than they bargained for.

The complaint can thus be read to allege that the defendants' misstatements regarding the cost of the annuities caused the plaintiffs harm because: (1) they induced the plaintiffs to agree to the structured settlements, under which they ultimately received an annuity with a lower value than had been promised them; and (2) had the plaintiffs known that the cost to the defendants was less than what had been represented, they either could have attempted to negotiate for a better overall settlement value or requested to receive cash rather than the income stream produced by the annuities. Because the plaintiffs have thus pleaded sufficient facts upon which to demonstrate both the manner in which they were misled by the defendants' representations regarding the cost of the annuities, as well as the resulting harm, counts six and seven should survive the defendants' motion to strike.

## G

### Count Eight

In count eight of their complaint, the plaintiffs asserted that the defendants have engaged in a civil conspiracy by "[acting] in concert and [aiding] and [abetting] one another in the common purpose of causing [the] plaintiffs . . . to enter into wrongful structured settlements . . . and concealing such illicit conduct from the plaintiffs . . . ." The defendants argue that this count should be stricken because the plaintiffs: (1) "do not point to a single criminal or unlawful act that might constitute such aiding and abetting by the . . . defendants"; and (2) cannot allege any legally cognizable damages. We disagree.

Because we have addressed the issue of damages several times in this opinion, we turn to the defendants' other alternate ground for striking the civil conspiracy count, namely, that the plaintiffs have failed to allege that the defendants cooperated in any unlawful schemes. In order to survive a motion to strike a civil conspiracy count, the plaintiffs must properly allege: "(1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff." (Internal quotation marks omitted.) *Marshak* v. *Marshak*, 226 Conn. 652, 665, 628 A.2d 964 (1993), overruled on other grounds, *State* v. *Vakilzaden*, 251 Conn. 656, 666, 742 A.2d 767 (1999). Regarding the second element of civil conspiracy, the plaintiffs point to two actions allegedly carried out by the defendants, which the plaintiffs contend are illegal: (1) the rebating scheme, which allegedly violates both Connecticut and New York law; see General Statutes § 38a-825; N.Y. Ins. Law § 2324 (McKinney 2000); and

(2) the solicitation and sale of life insurance products without a license to do so.

With respect to the rebating scheme, the plaintiffs claim that: (1) due to either a corporate relationship or specific agreement, all defendants were aware of, and knowing participants in, the rebating scheme; (2) "[v]arious mergers and/or acquisitions involving [Travelers Group] and/or other Travelers entities have also resulted in questions arising concerning the nature of the rebating, and likewise have resulted in further efforts to white-wash and cover-up the illegal practices described herein"; and (3) "[s]enior management of [Travelers Casualty] and [Travelers Annuity] have repeatedly admonished middle managers and others within their organizations not to refer to the rebates and kickbacks as anything other than 'service reimbursements,' for fear of the consequences of any such characterizations." As for the plaintiffs' claim that Travelers Casualty allegedly has solicited and sold life insurance policies, the plaintiffs claim that Travelers Casualty, Travelers Annuity and Travelers Group all "instructed claims adjusters to avoid the use of certain phrases when selling annuities" so as to sidestep accusations that they were actually selling annuities.

Even if we were to assume, as we do only for purposes of this appeal, that the rebating scheme is illegal, and that Travelers Casualty is unlawfully soliciting and selling life insurance products, the plaintiffs have sufficiently alleged that all of the defendants participated in those acts and, in some instances, attempted to cover them up. Consequently, the plaintiffs' civil conspiracy count should not be stricken.

## H

### Count Nine

Count nine of the plaintiffs' complaint alleged that the defendants committed conversion whereby they

"assumed control and exercised ownership rights over money belonging to the plaintiffs and . . . appropriated such money for themselves to the detriment of the plaintiffs . . . ." The defendants contend that the alleged rebates are not the property of the plaintiffs and, therefore, that count nine should be stricken because the defendants "never assumed unauthorized control over anything belonging to the plaintiffs . . . ." We agree.

"We have defined conversion as [a]n unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights. . . . It is some unauthorized act which deprives another of his property permanently or for an indefinite time; some unauthorized assumption and exercise of the powers of the owner to his harm. The essence of the wrong is that the property rights of the plaintiff have been dealt with in a manner adverse to him, inconsistent with his right of dominion and to his harm." (Internal quotation marks omitted.) *Aetna Life & Casualty Co.* v. *Union Trust Co.*, 230 Conn. 779, 790–91, 646 A.2d 799 (1994); see also D. Wright & J. Fitzgerald, Connecticut Law of Torts (2d Ed. 1968) § 25, p. 28 ("[a]n action of conversion is a suit for damages by the owner of a chattel, or by one entitled to the immediate possession of the chattel, against one who has wrongfully appropriated the chattel or has tampered with the chattel in derogation of the rights of the rightful owner or possessor"). Thus, for the plaintiffs' conversion claim to survive a motion to strike, the plaintiffs must present a theory of how either the rebates, or the money that the defendants allegedly have retained through their short-changing scheme, are the plaintiffs' property.

First, viewing the rebating allegations in a light most favorable to the plaintiffs, they asserted that: (1) the plaintiffs and Travelers Casualty agreed on a settlement;

(2) the plaintiffs agreed to have Travelers Casualty invest a sum certain of that settlement in an annuity; (3) this sum certain was the cost of the annuity to Travelers Casualty, and was also the present value of the annuity; (4) after Travelers Casualty received a portion of the commission that the broker had received from the sale of that annuity, the net cost of the annuity to Travelers Casualty was less than what it had agreed to pay for the annuity; and (5) as a result, Travelers Casualty, in effect, was still in possession of a portion of that sum certain that it had agreed to invest for the plaintiffs. Despite these allegations, the plaintiffs' conversion claim must fail because they cannot point to specific, identifiable money to which they had a right, just as they must in order to support a conversion claim regarding any other type of chattel.

Generally, "[a] plaintiff must establish legal ownership or right to possession in the particular thing, the specifically identifiable moneys, that the defendant is alleged to have converted." *Columbia Marine Services, Inc.* v. *Reffet Ltd.*, 861 F.2d 18, 23 (2d Cir. 1988); see also *National Union Fire Ins. Co.* v. *Wilkins-Lowe & Co.*, 29 F.3d 337, 340 (7th Cir. 1994) ("[A]n action for conversion of funds may not be maintained to satisfy a mere obligation to pay money. . . . It must be shown that the money claimed, or its equivalent, at all times *belonged to the plaintiff* and that the defendant converted it to his own use." [Emphasis in original; internal quotation marks omitted.]); *Belford Trucking Co.* v. *Zagar*, 243 So. 2d 646, 648 (Fla. App. 1970) ("The requirement that the money be identified as a specific chattel does not permit as a subject of conversion an indebtedness which may be discharged by the payment of money generally. . . . A mere obligation to pay money may not be enforced by a conversion action . . . and an action in tort is inappropriate where the basis of the suit is a contract, either express or implied."

[Citations omitted.]). Given that the plaintiffs did not allege that they owned or were ever in possession of the money that, they contended, is currently in the defendants' possession, their conversion claim, as to the rebating scheme, must be stricken.

Following this same logic, the plaintiffs' conversion claim as to the defendants' short-changing scheme must be stricken. Here, the plaintiffs have alleged that when Travelers Casualty agreed to fund an annuity for Huaman, Travelers Casualty represented to her that it would spend $6667 on the annuity. The plaintiffs further alleged that Travelers Casualty spent $6569.51 on that annuity and retained the remaining $97.49 without notifying Huaman. As with the rebating allegations, the plaintiffs did not allege that Huaman owned or was ever in possession of any portion of the $6667 that Travelers agreed to spend for her annuity. The plaintiffs also did not point to specific, identifiable money to which they had a right of possession. Consequently, the plaintiffs' conversion count regarding the short-changing scheme must be stricken.

I

Count Ten

Count ten of the plaintiffs' complaint alleged that the "[d]efendants will be unjustly enriched if they are allowed to retain the monies derived from their wrongful conduct." The defendants claim that this count should be stricken because the "plaintiffs do not allege (as they must) how they were misled or harmed in any material way . . . ." As we explained in part I of this opinion, the plaintiffs' allegations sufficiently stated a legally cognizable claim for damages. Therefore, count ten of the plaintiffs' complaint is sufficient to survive a motion to strike.

### III

Finally, the defendants assert that, even if this court denies their motion to strike the complaint in its entirety, the claims as to Travelers Group and Smith Barney should be stricken because the plaintiffs have not alleged any facts to support their allegations against these two defendants. As to Smith Barney, the defendants contend that the plaintiffs failed to allege that either of their structured settlements was entered into during the time period that Smith Barney allegedly had a commission sharing arrangement with Travelers Casualty, namely, from 1994 to the present. With respect to Travelers Group, the defendants claim that the "plaintiffs do not identify any action (or inaction) on the part of [Travelers Group]" other than being the corporate parent for the other defendants. We disagree with the defendants' characterization of the plaintiffs' allegations.

Turning first to Smith Barney, the plaintiffs alleged that Smith Barney entered into a commission sharing arrangement with Travelers Casualty in January, 1994. The plaintiffs further alleged that Huaman's "settlement was embodied in, among other things, a September 27, 1994, Infant Compromise Order" entered by a New York court. Lastly, the plaintiffs' complaint alleged that Smith Barney was the insurance broker that collected and forwarded to Travelers Casualty a portion of the rebate it received from arranging Huaman's annuity. Given these statements, the plaintiffs properly have alleged that Smith Barney was involved in procuring Huaman's structured settlement for Travelers Casualty.

As for the claims against Travelers Group, the plaintiffs alleged that, as part of the rebating scheme, "[n]otwithstanding the obvious encouragement to sell annuities, [Travelers Casualty, Travelers Annuity, and Travelers Group] instructed claims adjusters to avoid

the use of certain phrases when selling annuities in a blatant effort to avoid the consequences which might result from the acknowledgement of the conduct which adjusters were encouraged to engage in." Contrary to the defendants' assertion, the plaintiffs have alleged specific action on the part of Travelers Group to further the rebating scheme alleged by the plaintiffs. Consequently, we find no merit to the defendants' argument that the counts against Smith Barney and Travelers Group should be stricken.

The judgment is reversed with respect to counts three, four, six, seven, eight and ten of the plaintiffs' complaint and the case is remanded to the trial court with direction to deny the motion to strike as to those counts, and for further proceedings according to law; the judgment is affirmed with respect to counts one, two, five and nine of the plaintiffs' complaint.

In this opinion the other justices concurred.