******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DANIEL RUSSBACH *v.* MARISOL
YANEZ-VENTURA ET AL.
(AC 44232)

Elgo, Alexander and Suarez, Js.

*Syllabus*

The plaintiff R, who sustained injuries after he was injured in a motor vehicle
collision involving an uninsured motorist, sought to recover uninsured
motorist benefits allegedly due under an automobile insurance policy
issued by the defendant W Co. At the time of the accident, R was
operating a vehicle owned by a car dealership and covered by a commer-
cial garage insurance policy issued by W Co. The trial court granted W
Co.'s motion to bifurcate the issues of the insurance coverage limits
and damages. A bifurcated trial before the court followed, limited to
the issue of uninsured motorist coverage provided by the policy. During
the trial, the sole witness, B, the owner of the dealership, testified
credibly that he did not have education or formal training on risk loss
and insurance purchasing but wanted to have the minimum amounts
of uninsured motorist coverage required by state law as the dealership
was not in the business of loaning or renting cars. B consulted with an
insurance professional, C, to provide him advice, which he considered
in determining the scope of coverage for the dealership. B attested that
he received a waiver form from C, which listed $100,000 in uninsured
motorist coverage, reviewed it, knowingly approved his selection, and
signed his name on the last page of the form and sent it back to C. In
its memorandum of decision, the court determined, inter alia, that the
dealership, the only named insured on the policy, knowingly made an
informed decision to reduce the uninsured motorist coverage from $1
million, the amount of liability coverage under the policy, to $100,000
on the waiver form, and, although the waiver form did not contain a
statement of premium costs for each of the uninsured motorist coverage
options available as required pursuant to the applicable statute (§ 38a-
336 (a) (2)), which permits the named insured to request a lesser amount
of uninsured motorist coverage in writing, such noncompliance was
excused because the policy was for a commercial garage. Thereafter,
R moved for an articulation, which the court granted. The court expressly
indicated that it had determined, based on B's testimony at trial that
the dealership had knowingly selected $100,000 in standard, rather than
conversion, uninsured motorist coverage. Subsequently, W Co. filed a
motion for summary judgment on the remaining issue of damages, claim-
ing that it was entitled to judgment as a matter of law because R had
received workers' compensation benefits in excess of $100,000, which
offset the $100,000 in uninsured motorist coverage under the policy.
The court granted W Co.'s motion for summary judgment and rendered
judgment in its favor. Thereafter, following R's death, the court granted
the motion to substitute the coadministrators of R's estate as plaintiffs.
Subsequently, the substitute plaintiffs appealed from the judgment of
the trial court, claiming that the court improperly concluded that W
Co.'s failure to comply with the statutory requirements of § 38a-336 (a)
(2) was excused under the particular facts of this case and improperly
concluded that the policy in question provided for standard, rather than
conversion, insurance coverage. On the substitute plaintiffs' appeal to
this court, *held*:

1. The trial court improperly concluded that W Co.'s failure to comply with
the statutory requirements of § 38a-336 (a) (2) was excused: contrary
to W Co.'s contention that *Frantz* v. *United States Fleet Leasing, Inc.*
(245 Conn. 727), *Kinsey* v. *Pacific Employers Ins. Co.* (277 Conn. 398),
and *McDonald* v. *National Union Fire Ins. Co. of Pittsburgh*, *PA* (79
Conn. App. 800), created an exception for every case involving a commer-
cial fleet or garage insurance policy, those cases recognized a limited
exception to the statutory requirements of § 38a-336 (a) (2) that were
fact-specific and predicated on several factors that distinguished com-
mercial entities from typical purchasers of insurance, including that the
policies involved a large commercial entity with departments specializ-

ing in legal and insurance matters, were procured by insurance specialists who were fully aware of the relative cost of uninsured motorist coverage, and covered a mass fleet of automobiles used to conduct large-scale commercial activities, the unreasonable and impracticable result of requiring strict adherence to the statutory requirements when there were numerous named insureds on the policy, whether the commercial entity was self-insured, and the premium amounts paid, and the present case differed from *Frantz*, *Kinsey*, and *McDonald*, as the dealership was not a large commercial entity, it was a local business involved in repair and used car sales with only ten to twenty vehicles for sale at that time that remained primarily on the dealership property, it was not self-insured, its annual insurance premium was far less than the premiums paid by large commercial entities, and the dealership was the only named insured on the policy; moreover, B, who was responsible for procuring insurance for the dealership, had no education or formal training on risk loss and insurance purchasing and was not aware of the availability, relative costs, and benefits of uninsured motorist coverage and, therefore, relied largely on C to advise him, which was further demonstrated by his testimony that he requested the minimum amount of uninsured motorist coverage required by state law from C but procured $100,000 in uninsured motorist coverage—more than double the $40,000 required by state law; accordingly, because the dealership's uninsured motorist coverage was not effectively reduced pursuant to § 38a-336 (a) (2), summary judgment should not have been granted as a triable issue remained as to the amount of damages, as the $1 million liability coverage under the policy exceeded the workers' compensation benefits that R received.

2. The trial court properly determined that the policy provided for standard, rather than conversion, uninsured motorist insurance coverage: the policy was ambiguous as to whether it provided standard or conversion uninsured motorist insurance coverage, and, because the issue of whether the dealership purchased standard or conversion coverage presented a question of historical fact, rather than one of contract construction, an examination of extrinsic evidence determined the parties' intentions, B's testimony at trial having undermined R's claim that the dealership intended to purchase enhanced coverage for an additional premium, as B testified that he wanted to have the minimum amount of insurance coverage required by state law and that he did not know what conversion coverage was and never asked C about it; moreover, this court declined to incorporate by reference language from the preprinted waiver form, which provided that the policy would be issued with the highest level of coverage selected if more than one coverage option was selected, because, as this court determined, the waiver form was an ineffective attempt to reduce the uninsured motorist coverage under the policy and the uncontroverted evidence in the record demonstrated that B did not select any of the boxes for a specific coverage option and did not intend to purchase conversion coverage for the dealership.

Argued January 18—officially released June 7, 2022

*Procedural History*

Action to recover, inter alia, uninsured motorist benefits allegedly due under an automobile policy issued by the defendant Wesco Insurance Company, and for other relief, brought to the Superior Court in the judicial district of New Haven, where the court, *Abrams*, *J.*, granted the defendant Wesco Insurance Company's motion to bifurcate the issues of insurance coverage limits and damages; thereafter, the matter was tried to the court, *Ozalis*, *J.*, on the issue of the insurance coverage limits; judgment for the defendant Wesco Insurance Company; subsequently, the court, *Abrams*, *J.*, granted the defendant Wesco Insurance Company's motion for summary judgment on the issue of damages; thereafter, Kristina Bakes, coadministrator of the estate of Daniel Russbach, et al. was substituted as the plaintiff; subsequently, the substitute plaintiffs appealed to

this court. *Reversed in part; further proceedings.*

*Chet L. Jackson,* for the appellants (substitute plaintiffs).

*John W. Cannavino, Jr.,* with whom, on the brief, was *Ryan T. Daly,* for the appellee (defendant Wesco Insurance Company).

*Opinion*

ELGO, J. In this insurance coverage dispute, the substitute plaintiffs, Kristina Bakes and Marlene Esposito, coadministrators of the estate of Daniel Russbach (decedent),[1] appeal from the judgment of the trial court in favor of the defendant Wesco Insurance Company.[2] On appeal, the plaintiffs contend that the court improperly concluded that (1) the defendant's failure to comply with the statutory requirements of General Statutes § 38a-336 (a) (2) was excused under the particular facts of this case and (2) the insurance policy in question provided for standard, rather than conversion, insurance coverage.[3] We affirm in part and reverse in part the judgment of the trial court.

The facts of the underlying automobile accident are not in dispute. On October 26, 2015, the decedent was operating a vehicle in New Haven owned by West Shore Motors (dealership), a used car dealership and repair center in Milford. As the decedent proceeded through a green light, Marisol Yanez-Ventura, an uninsured driver, negligently turned her vehicle into the decedent's lane of traffic, causing a head-on collision that resulted in catastrophic injuries to the decedent.

The decedent thereafter commenced the present action. Relevant to this appeal is the third count of his complaint,[4] which alleged that the vehicle driven by the decedent on October 26, 2015, was insured by the defendant under policy number WPP12545600 (policy). The complaint further alleged that the policy provided $1 million in uninsured motorist coverage.[5] In its answer, the defendant denied the substance of the latter allegation. The defendant also alleged, as special defenses, that any recovery obtained by the decedent must be reduced by all sums received from collateral sources and that such recovery "is limited to the applicable limits of the [policy], namely, $100,000 minus all applicable credits, reductions and offsets."

On June 20, 2017, the defendant filed a motion to bifurcate the issue of the insurance coverage limits and the issue of damages, which the court granted. A bifurcated trial before the court followed, limited to the issue of the extent of uninsured motorist coverage under the policy. The sole witness at trial was Jason Kenneth Blake, who owned the dealership at all relevant times, and whose testimony the court ultimately found credible. Blake offered uncontroverted testimony that he was solely responsible for procuring and "making decisions as to insurance coverage" for the dealership. Blake also testified that he did not have "any education or formal training on risk loss and insurance purchasing."

Blake testified that the dealership was "not in the business of loaning cars" and that the dealership had only "ten [or] twenty" cars for sale in the fall of 2015.

Blake explained that "the majority of [the dealership's] business was done on the property" and "operated more off our lot, even though we did [allow] test drives on cars . . . we really weren't in the business of doing loaner cars. Occasionally we did, and, so I didn't think we needed a whole lot of [insurance] coverage for that area." Because the dealership was not in the business of loaning or renting cars, Blake testified that he "wanted to have the minimum amounts [of uninsured motorist coverage] required by the state of Connecticut."

Blake testified that, in procuring insurance coverage for the dealership, he consulted with Mike Castellini of McCormick Insurance Agency, an agency located in New Jersey. The policy obtained by the dealership, a copy of which was admitted into evidence at trial, was a commercial garage policy that provided $1 million in liability coverage. The only named insured on the policy was the dealership.

Also admitted into evidence was a copy of a document titled "Connecticut Uninsured/Underinsured Motorists Coverage Selection and Informed Consent Form" (waiver form) signed by Blake on April 23, 2015.[6] It is undisputed that the waiver form did not specify the amount of liability coverage provided by the policy. The waiver form also did not disclose the premium costs for any of the eighty-two uninsured motorist coverage options listed on pages three and four of that form as required by § 38a-336 (a) (2); the area designated for the "Total Coverage Premium" for each of those options on the form was left blank, as Blake admitted at trial.[7] Nonetheless, a handwritten check mark appeared next to the $100,000 "Combined Single Limit" options on the form, and Blake testified that "$100,000 was what was required [under Connecticut law] and that's what I wanted." As Blake explained, he "wanted the minimum amount of insurance for uninsured motorist" coverage available. Blake also testified that neither the writing on page one of the waiver form—which listed the name of the applicant, the policy's effective date, and the producer of the policy—nor the check marks on certain boxes were made by him.[8] Rather, he testified that the only writing on the waiver form that was his was the signature on page four.

In its January 30, 2018 memorandum of decision, the court found that Blake "was the person responsible for purchasing insurance for [the dealership] in 2015. Blake testified credibly that he consulted with an insurance professional to provide him advice, which he considered in determining the scope of insurance coverage for the business. Blake wanted low cost insurance and *the lowest possible [uninsured motorist] coverage that was allowed* and made the decision to obtain less [uninsured motorist] coverage than the bodily liability limits. Blake credibly testified at trial that he received the

waiver form which his insurance agent asked him to review, reviewed it, knowingly approved his selection and sent it back to the agent. . . . The waiver form lists $100,000 in [uninsured motorist] coverage. . . . This court further finds Blake's testimony to be credible as to the procurement of this commercial automobile insurance policy and his desire to have *the lowest possible* [*uninsured motorist*] *coverage for such vehicles.* Blake was credible as to his review and understanding of the waiver form and his knowing selection of the lower $100,000 [uninsured motorist] coverage." (Citations omitted; emphasis added.) The court thus concluded that the dealership "knowingly made an informed decision to reduce the [uninsured motorist] coverage to $100,000 from the $1,000,000 bodily injury liability coverage and that the . . . coverage was properly reduced to $100,000."[9] Although it found that the waiver form "did not contain a statement of premium costs," the court concluded that such noncompliance with the statutory requirements of § 38a-336 (a) (2) was excused because the policy was for a commercial garage.

The decedent thereafter filed a motion for articulation, in which he sought clarification as to whether the court had found that the dealership "knowingly selected $100,000 in standard [uninsured motorist] coverage or $100,000 in conversion . . . coverage" and the factual basis for that determination. The court granted that motion and, in its April 13, 2018 articulation, expressly indicated that the dealership had knowingly selected $100,000 in standard uninsured motorist coverage. The court further stated that the factual basis for that determination was Blake's testimony at trial that he had selected a policy for $100,000 "with standard uninsured motorist coverage . . . and . . . that's what I understood this to mean. . . . I was picking the $100,000 limit for uninsured motorist."

On February 8, 2019, the defendant filed a motion for summary judgment on the remaining issue of damages. The defendant argued that no genuine issue of material fact existed in light of the court's determination that the policy contained $100,000 in uninsured motorist coverage. Because the decedent had received workers' compensation benefits in excess of $100,000,[10] which operate as an offset to the uninsured motorist coverage under the policy, the defendant claimed that it was entitled to judgment as a matter of law.[11] In opposing the motion for summary judgment, the decedent claimed that a genuine issue of material fact existed as to whether the waiver form signed by Blake was valid.

In its August 11, 2020 memorandum of decision, the court first noted the undisputed fact that the decedent had received $292,540.06 in workers' compensation benefits, which "offset the $100,000 in coverage" under the policy. The court then rejected the decedent's chal-

lenge to the validity of the waiver form. The court thus rendered summary judgment in favor of the defendant, and this appeal followed.

On appeal, the plaintiffs raise two claims related to the court's determinations following the bifurcated trial, as set forth in its January 30, 2018 memorandum of decision and its April 13, 2018 articulation, on the extent of uninsured motorist coverage under the policy. We address each claim in turn.

I

The plaintiffs first contend that the court improperly concluded that the defendant's failure to comply with the statutory requirements of § 38a-336 (a) (2) was excused. The issue we must decide is whether, as a matter of law, the construction of § 38a-336 (a) (2) articulated by our Supreme Court in *Frantz* v. *United States Fleet Leasing, Inc.*, 245 Conn. 727, 738–43, 714 A.2d 1222 (1998), applies to the uncontroverted factual scenario presented by this case. Our review, therefore, is plenary. Id., 736.

Section 38a-336 (a) (1) (A), the Connecticut uninsured motorist statute, requires in relevant part that "[e]ach automobile liability insurance policy shall provide insurance, herein called uninsured and underinsured motorist coverage, in accordance with the regulations adopted pursuant to section 38a-334 . . . for the protection of persons insured thereunder who are legally entitled to recover damages because of bodily injury, including death resulting therefrom . . . ." As our Supreme Court has explained, "[t]he public policy established by the uninsured motorist statute is to ensure that an insured recovers damages he or she would have been able to recover if the uninsured motorist had maintained a policy of liability insurance." *Sandor* v. *New Hampshire Ins. Co.*, 241 Conn. 792, 800, 699 A.2d 96 (1997); see also *Doyle* v. *Metropolitan Property & Casualty Ins. Co.*, 252 Conn. 79, 84, 743 A.2d 156 (1999) ("the purpose of underinsured motorist coverage is to protect the named insured and other additional insureds from suffering an inadequately compensated injury caused by an accident with an inadequately insured automobile" (internal quotation marks omitted)). In light of "the broad, remedial purpose of the uninsured motorist statute . . . [our Supreme Court has] stated that an insurer may [not] circumvent th[at] public policy . . . ." (Citation omitted; internal quotation marks omitted.) *Tannone* v. *Amica Mutual Ins. Co.*, 329 Conn. 665, 673, 189 A.3d 99 (2018).

At issue in this appeal is subdivision (2) of § 38a-336 (a). That subdivision begins by requiring in relevant part that "each automobile liability insurance policy . . . *shall* provide uninsured and underinsured motorist coverage with limits for bodily injury and death *equal* to those purchased to protect against loss resulting

from the liability imposed by law . . . ."[12] (Emphasis added.) General Statutes § 38a-336 (a) (2). It then qualifies that requirement by permitting a "named insured" to request "a lesser amount" in writing. General Statutes § 38a-336 (a) (2). Significantly, the statute mandates that "[n]o such written request for a lesser amount shall be effective unless any named insured has signed an informed consent form that shall contain: (A) An explanation of uninsured and underinsured motorist insurance approved by the commissioner; (B) a list of uninsured and underinsured motorist coverage options available *from the insurer*; and (C) the premium cost for each of the coverage options available *from the insurer* . . . ." (Emphasis added.) General Statutes § 38a-336 (a) (2). Because the plain purpose of such a form is to apprise a purchaser of insurance of that information, the burden necessarily is on the insuring party to provide the information specified in § 38a-336 (a) (2) to the purchaser.

In *Nationwide Mutual Ins. Co.* v. *Pasion*, 219 Conn. 764, 594 A.2d 468 (1991), our Supreme Court considered the efficacy of a written request to reduce uninsured motorist coverage pursuant to General Statutes (Rev. to 1989) § 38-175c (a) (2), the precursor to § 38a-336 (a) (2).[13] The main issue in that appeal was "whether a written request to reduce uninsured motorist coverage by one of two named insureds on an automobile liability insurance policy is sufficient to satisfy the writing required" under that statute. Id., 765. Although there were two named insureds on the policy in question, a husband and wife, only the husband had signed the request to reduce uninsured motorist coverage. Id., 766. The court first concluded that the statutory language in question was ambiguous because, as applied to the facts of that case, it was unclear whether the term "insured" referred to *any* named insured or to *all* named insureds. Id., 769. The court then reviewed the legislative history of the statute and concluded: "The apparent intent of the legislature . . . was to assure that consumers purchasing automobile liability insurance would be made aware of the low cost of equal amounts of uninsured coverage by requiring any reduction in that coverage to be in writing. . . . [T]o construe the term 'insured' . . . as [the plaintiff insurance company] urges would thwart the intent of the legislature. . . . To permit the signature of one named insured to bind other, possibly uninformed, named insureds would circumvent the legislature's intent that the decision to reduce uninsured motorist coverage by consumers be an informed one." (Citations omitted.) Id., 770–71. Accordingly, the court held that the written request to reduce uninsured motorist coverage "was ineffective to reduce the uninsured motorist benefits available to a third party who had been injured in an accident while a passenger in a vehicle covered under the policy." *Colonial Penn Ins. Co.* v. *Bryant*, 245 Conn. 710, 712,

714 A.2d 1209 (1998), citing *Nationwide Mutual Ins. Co.* v. *Pasion*, supra, 771.

Seven years later, the Supreme Court considered a similar claim in a completely different context. As the court stated, the "issue that we must decide is whether, as a matter of law, the construction of [the precursor to § 38a-336 (a) (2)] that we articulated in [*Pasion*] applies to the different factual scenario presented by this case." *Frantz* v. *United States Fleet Leasing, Inc.*, supra, 245 Conn. 736. *Frantz* involved a lease agreement between United States Fleet Leasing, Inc. (Fleet Leasing), which owned a fleet of passenger vehicles, and General Dynamics Corporation (General Dynamics). Id., 730. As the court emphasized early in its opinion, "[b]oth Fleet Leasing and General Dynamics are large corporations with their own legal and risk management departments." Id., 730 n.6.

On September 11, 1992, one of the vehicles owned by Fleet Leasing and leased by General Dynamics was involved in an accident. Id., 730. That vehicle "was insured under an automobile liability insurance policy that had been issued by the defendant [insurance company] to General Dynamics." Id. That policy "covered approximately 2208 private passenger vehicles that were either owned or leased by General Dynamics and that were located in various states" and "provided liability coverage of $2 million per accident . . . ." Id., 731. Under the policy, "[t]he term 'named insured' . . . include[d], subject to certain limitations, various subsidiaries, affiliates and joint ventures of General Dynamics, the United States of America and 'any other person or organization for which [General Dynamics] has agreed in writing to provide insurance . . . .' " Id., 732. In procuring that policy, a representative of General Dynamics had submitted a written request to reduce its uninsured motorist coverage to $40,000 per accident. Id., 731, 733.

The plaintiffs, all employees of General Dynamics who were injured in the September 11, 1992 accident, subsequently brought suit against Fleet Leasing and the insurance company to recover uninsured motorist benefits under the fleet insurance policy issued to General Dynamics. Id., 733. They later moved for summary judgment, relying principally on the precedent set in *Pasion* and arguing that "General Dynamics' election of lower uninsured motorist coverage was invalid because it had not been signed by Fleet Leasing, a named insured . . . ." Id., 733–34. The trial court granted that motion, concluding that "the plaintiffs were entitled to uninsured motorist coverage of $2 million under [the Supreme Court's] decision in *Pasion* because Fleet Leasing, a named insured, had failed to submit a written request for a reduction in [uninsured motorist] coverage . . . ." Id., 734.

On appeal, the defendants claimed that "the factual

differences between *Pasion* and the present case warrant a different application of § 38a-336 (a) (2). Specifically, they argue[d] that the policy considerations underlying the enactment of § 38a-336 (a) (2) that formed the basis of [the] holding in *Pasion* are inapplicable in the context of commercial fleet insurance. They claim[ed], moreover, that to construe that statutory provision to require the written consent of all named insureds on a commercial fleet policy would place an unreasonable and unintended burden on insurers because, as in this case, the number of prospective insureds under a fleet policy is likely to be substantial." Id., 738.

The Supreme Court agreed with the defendants and articulated a narrow exception to the statutory requirements of § 38a-336 (a) (2). Applying well established principles of statutory construction, the court concluded that "the legislature did not intend to require the written consent of *all* named insureds on a commercial fleet policy as a necessary prerequisite to a reduction in coverage. First, we are not persuaded that requiring Fleet Leasing to provide a written request for a reduction in uninsured motorist coverage under the [insurance] policy would further the legislative goal of ensuring that consumers are informed of the relative cost of this type of insurance. Although a corporation like Fleet Leasing may be considered a 'consumer' of insurance in the broadest sense of that word, we do not believe that a company that, like Fleet Leasing, is covered under a commercial fleet policy, falls within the class of consumers that the legislature sought to protect in requiring the signature of all named insureds under § 38a-336 (a) (2). Fleet Leasing, like many other large corporations covered under commercial fleet policies, has departments that specialize in legal and insurance matters. It is highly likely, therefore, that the Fleet Leasing personnel who negotiated the insurance provisions of the lease contract with General Dynamics were fully aware of the relative cost of uninsured motorist coverage and the implications of their decision to leave to General Dynamics the determination of the amount of uninsured motorist coverage." (Emphasis added.) Id., 738–39.

The court also noted that "the primary legislative purpose in requiring a written request for a reduction in uninsured motorist coverage is to ensure that one named insured not be bound, to his or her detriment, by the unilateral decision of another named insured to seek such a reduction. . . . Furthermore, strict adherence in this case to the rule that we deemed applicable in *Pasion* would have required the written consent not only of Fleet Leasing, but of all other named insureds on the policy, a result that is both unreasonable and impracticable. Under the terms of the endorsement to the policy, 'named insured' includes any other person or organization for which General Dynamics had agreed in writing to provide insurance and, subject to certain

limitations, the United States of America and various joint ventures of General Dynamics, as well as partners, executive officers and directors of those joint ventures. . . . Identifying all such persons and entities and securing their written consent to a reduction in uninsured motorist coverage would have created formidable administrative burdens for General Dynamics or its insurance underwriter, burdens that we believe it is most unlikely our legislature intended to impose under § 38a-336 (a) (2).'' (Citations omitted.) Id., 739–40. For those reasons, the court concluded that the holding of *Pasion* was inapplicable to such fleet insurance policies. Id., 740.

Our appellate courts have applied the narrow exception articulated in *Frantz* on two occasions. In *McDonald* v. *National Union Fire Ins. Co. of Pittsburgh, PA*, 79 Conn. App. 800, 801–802, 831 A.2d 310, cert. denied, 266 Conn. 929, 837 A.2d 802 (2003), one of the plaintiffs was injured in an automobile accident while operating a car owned by her employer, Cumberland Farms, Inc., that was insured under a fleet insurance policy issued by the defendant. The plaintiff sought to collect underinsured motorist benefits pursuant to that policy, claiming that ''the attempt by Cumberland Farms, Inc., to reduce the underinsured motorists policy limit . . . was ineffective because the informed consent form signed by Cumberland Farms, Inc., did not comply with the requirements of § 38a-336 (a) (2). Specifically, the plaintiffs argue[d] that the form signed by Cumberland Farms, Inc., did not 'contain . . . the premium cost for each of the coverage options available from the insurer,' as required by § 38a-336 (a) (2) (C).'' Id., 804.

On appeal, this court agreed with the trial court's determination that Cumberland Farms, Inc., had effectively reduced the limit of underinsured motorist coverage under the policy. Id., 805. The court began by noting that ''[o]ne of the guiding principles underlying the requirement of a written rejection of higher limits is to assure that the rejection is the product of a 'purposeful and knowing decision' . . . and that the request is an 'informed one.' '' (Citation omitted.) Id., 805. The court then reviewed *Frantz* in detail and reiterated that ''large corporations covered under commercial fleet policies [have] departments that specialize in legal and insurance matters'' whose ''personnel . . . were fully aware of the relative cost of uninsured motorist coverage and the implications of their decision . . . .'' (Internal quotation marks omitted.) Id., 806. The court also observed that § 38a-336 (a) (2) ''has been interpreted to impose lesser requirements on self-insurers.'' Id.

This court then concluded that the reasoning of *Frantz* ''dictates the resolution of the issue in the plaintiffs' appeal. Cumberland Farms, Inc., is a large commercial entity. Its insurance premiums range from $127,459 to $518,207. Here, as in *Frantz*, [i]t is highly likely . . .

that the . . . personnel who negotiated the insurance provisions of the [insurance] contract . . . were fully aware of the relative cost of uninsured motorist coverage and the implications of their decision . . . ." (Internal quotation marks omitted.) Id., 807. The court continued: "The purpose of § 38a-336 (a) (2), including the provision requiring that insurers inform consumers of the premium cost for each of the underinsured motorists coverage options available, is to facilitate consumers' decision-making process and to ensure that they give informed consent to reduced coverage. We do not believe that a company such as Cumberland Farms, Inc., *which insures a fleet of vehicles to carry on a large commercial enterprise*, falls within the class of consumers that the legislature sought to protect when it mandated the disclosure of premium costs under § 38a-336 (a) (2). Consequently, the fact that the informed consent form in the present case did not contain a statement of premium costs does not defeat the election by Cumberland Farms, Inc., to reduce its underinsured motorists coverage limits . . . ." (Emphasis added.) Id.

The Supreme Court reached a similar result in *Kinsey* v. *Pacific Employers Ins. Co.*, 277 Conn. 398, 891 A.2d 959 (2006). The issue in that case was whether a written request to reduce uninsured motorist coverage under a fleet insurance policy was effective when "certain language in the [written] . . . request was [not] made . . . in twelve-point type as required by . . . § 38a-336 (a) (2)." Id., 400. The plaintiff, "who was operating a vehicle owned by his employer and insured under a commercial fleet automobile insurance policy issued by the defendant, sustained injuries that were caused by an underinsured motorist." Id. As the court emphasized, the plaintiff's employer was "a corporation with over 2700 employees" that "was insured under a commercial fleet automobile insurance policy issued . . . by the defendant. More than 1000 vehicles were covered under the policy." Id., 402.

Although the policy contained $1 million in liability coverage, the defendant claimed that "the total amount of underinsured motorist coverage available under [the] policy was $40,000 . . . . The defendant [claimed] . . . that, prior to the date of the accident in which the plaintiff was injured, [the employer] had submitted to the defendant an 'Informed Consent Form,' signed by [its] vice president of risk, requesting that its uninsured and underinsured motorist coverage limit be reduced to $40,000." Id., 402. In response, the plaintiff "maintained that the request was ineffective because the informed consent form . . . did not comply with § 38a-336 (a) (2). In particular, § 38a-336 (a) (2) requires the inclusion of certain language, in the form of a heading in twelve-point type, on the informed consent form; it is undisputed that the form that [the employer] had submitted contained the required language, albeit in eight-point

type rather than twelve-point type." (Footnote omitted.) Id., 403.

In rejecting the plaintiff's claim, the court in *Kinsey* relied on the precedent set forth in *Frantz* and *McDonald*. After discussing those cases in detail, our Supreme Court stated: "We reach the same result in the present case. For the reasons enumerated in *Frantz* and *McDonald*, there is no reason to require strict adherence to the twelve-point type requirement of § 38a-336 (a) (2) in the context of a commercial fleet policy. . . . [The employer], which had more than 2700 employees and was insured under a commercial fleet policy covering more than 1000 vehicles, is not a member of the class of consumers that the legislature sought to protect when it enacted that typeface requirement. . . . [The employer's] vice president of risk, who signed the informed consent form on behalf of [the employer], attested to the fact that when she endorsed the form, she was 'fully cognizant of the availability, relative costs and benefits of uninsured and underinsured motorist coverage as well as the implications of selecting minimum coverage limits,' and that her endorsement reflected 'a conscious decision,' on behalf of [the employer], 'to select uninsured/ underinsured motorist limits of $40,000 in Connecticut.' Under the circumstances, we are unwilling to conclude that [the employer's] request for a reduction in uninsured and underinsured motorist coverage was ineffective even though, contrary to the dictates of § 38a-336 (a) (2), the heading of the informed consent form in which the request appeared was printed in eight-point type rather than twelve-point type." (Footnote omitted.) Id., 413–14.

*Frantz*, *McDonald*, and *Kinsey* all recognize a limited exception to the statutory requirements of § 38a-336 (a) (2). Contrary to the defendant's contention, they did not establish a sweeping exception that is categorically available in every case involving a fleet insurance policy. The holdings in those cases were fact-specific and predicated on a number of factors that distinguished the commercial entities in question from the typical purchaser of insurance. In each case, the insurance policy (1) involved a large commercial entity that had "departments that specialize in legal and insurance matters"; *Frantz* v. *United States Fleet Leasing, Inc.*, supra, 245 Conn. 739; (2) was procured by insurance specialists who "were fully aware of the relative cost of uninsured motorist coverage"; id.; see also *Kinsey* v. *Pacific Employers Ins. Co.*, supra, 277 Conn. 414 (policy negotiated by commercial entity's "vice president of risk" who "was fully cognizant of the availability, relative costs and benefits of uninsured and underinsured motorist coverage" (internal quotation marks omitted)); *McDonald* v. *National Union Fire Ins. Co. of Pittsburgh, PA*, supra, 79 Conn. App. 804 (policy negotiated by commercial entity's "risk manager"); and (3) covered a massive fleet of automobiles used to conduct large-scale com-

mercial activities.[14] Id., 807. In addition, the court in those cases considered the "unreasonable and impracticable" result of requiring strict adherence to the statutory requirements of § 38a-336 (a) (2) when there are numerous named insureds on a policy; see *Frantz* v. *United States Fleet Leasing, Inc.*, supra, 740; whether the commercial entity was self-insured; see *McDonald* v. *National Union Fire Ins. Co. of Pittsburgh, PA*, supra, 806–807; and the amount of insurance premiums paid. Id., 807. In that "different factual scenario"; *Frantz* v. *United States Fleet Leasing, Inc.*, supra, 736; the appellate courts of this state have held that strict compliance with the statutory requirements of § 38a-336 (a) (2) is not required because the "policy considerations underlying [its] enactment are . . . inapplicable . . . ." (Citations omitted.) Id., 738; see also *Kinsey* v. *Pacific Employers Ins. Co.*, supra, 413–14; *McDonald* v. *National Union Fire Ins. Co. of Pittsburgh, PA*, supra, 807, 811.

With those factors in mind, we turn to the undisputed facts of the present case, which are culled largely from Blake's uncontroverted testimony.[15] The dealership was not a large commercial entity but, rather, was a local business engaged in automotive repair and used car sales. As the court found, the dealership was "not in the business of loaning cars" and, unlike the massive fleets of vehicles in *Frantz*, *McDonald*, and *Kinsey*; see footnote 14 of this opinion; the dealership had only ten to twenty vehicles for sale or lease in the fall of 2015. Equally significant, those vehicles were not used to conduct "a large commercial enterprise"; *McDonald* v. *National Union Fire Ins. Co. of Pittsburgh, PA*, supra, 79 Conn. App. 807; but rather remained primarily on the dealership property. As Blake testified, "the majority of our business was done on the property" and "operated more off our lot, even though we did [allow] test drives on cars . . . we really weren't in the business of doing loaner cars. Occasionally we did, and, so I didn't think we needed a whole lot of [insurance] coverage for that area." The dealership also was not self-insured; *McDonald* v. *National Union Fire Ins. Co. of Pittsburgh*, supra, 806–807; and its $11,465 annual insurance premium was far less than the $127,459 to $518,207 in premiums paid by the large commercial entity in *McDonald*. Id., 807.

In *Frantz*, our Supreme Court predicated its decision in part on the fact that the insurance policy in question contained numerous named insureds. *Frantz* v. *United States Fleet Leasing, Inc.*, supra, 245 Conn. 740. Requiring all such named insureds to provide written consent to reduce the amount of uninsured motorist coverage, the court concluded, was "both unreasonable and impracticable" and "would have created formidable administrative burdens for [the commercial entity] or its insurance underwriter, burdens that we believe it is most unlikely our legislature intended to impose under § 38a-336 (a) (2)." Id. Those policy concerns are inappli-

cable to the present case, as the dealership was the only named insured on the policy here.

Perhaps most importantly, unlike the commercial entities in *Frantz*, *McDonald*, and *Kinsey*, the dealership did not have "departments that specialize in legal and insurance matters" or insurance specialists who "were fully aware of the relative cost of uninsured motorist coverage . . . ." Id., 739. Blake testified that, although he handled insurance matters for the dealership, he did not have "any education or formal training on risk loss and insurance purchasing." His uncontroverted testimony demonstrates that Blake was more akin to the typical purchaser of insurance.

On direct examination, Blake admitted that he relied on his insurance broker to advise him as to the costs relative to the policy and conceded that he was not familiar with the coverage limits in the policy. Blake also admitted that he had never read the policy in full, but "read the bold and the highlighted areas as I think most people would." Blake similarly testified that he did not read the waiver form "word for word"; instead, he "read the portions that were filled in, and [he] looked it over in general, and [he] signed it."

Blake also testified that he did not know the difference between liability coverage and uninsured motorist coverage and that he did not know what conversion coverage was. Although he admitted to approving an election for conversion coverage on page four of the waiver form, Blake qualified that statement by noting, "I don't exactly understand how conversion coverage works." When asked if he knew how much "it would cost to have had an equal amount of liability [and uninsured motorist] coverage," Blake admitted that he did not.

Even more revealing is Blake's testimony that he "wanted to have the minimum amounts [of uninsured motorist coverage] required by the state of Connecticut." In its memorandum of decision, the court specifically found that Blake wanted "the lowest possible [uninsured motorist] coverage that was allowed" under Connecticut law. That finding is difficult to reconcile with the fact that the policy Blake ultimately procured contained $100,000 in uninsured motorist coverage— *more than double* the $40,000 statutory minimum required under Connecticut law. See General Statutes (Rev. to 2015) § 14-112 (a). On cross-examination, Blake testified that he did not know that the statutory minimum was $40,000 in 2015. Upon learning that the statutory minimum was $40,000, Blake again confirmed that he had requested the minimum amount of uninsured motorist coverage from his insurance agent and stated, "up until [what counsel] just said, I was under the impression that the minimum was $100,000. That was what I thought it was at the time." That uncontroverted testimony demonstrates that, unlike the insurance spe-

cialists who negotiated the fleet insurance policies in *Frantz, McDonald*, and *Kinsey,* Blake was not "fully cognizant of the availability, relative costs and benefits of [uninsured] motorist coverage . . . ." (Internal quotation marks omitted.) *Kinsey* v. *Pacific Employers Ins. Co.,* supra, 277 Conn. 414.

As this court has noted, "[t]he purpose of § 38a-336 (a) (2), including the provision requiring that insurers inform consumers of the premium cost for each of the underinsured motorists coverage options available, is to facilitate consumers' decision-making process and to ensure that they give informed consent to reduced coverage." *McDonald* v. *National Union Fire Ins. Co. of Pittsburgh, PA*, supra, 79 Conn. App. 807. At its essence, the limited exception recognized in *Frantz* and its progeny is grounded in the presumption that large commercial entities staffed with dedicated insurance specialists do not fall "within the class of consumers that the legislature sought to protect when it mandated the disclosure of premium costs under § 38a-336 (a) (2)." Id. As evidenced by Blake's uncontroverted testimony at trial, the dealership was not such an entity.[16]

The defendant contends that its noncompliance with the statutory requirements of § 38a-336 (a) (2) should be excused because the policy in question was one for a commercial garage. In so arguing, the defendant overlooks the fact that the limited exception articulated in *Frantz*, *McDonald*, and *Kinsey* was fact-specific and animated by a number of factors, which we already have detailed. At its essence, the defendant's contention asks this court to expand that limited exception to encompass *all* commercial fleet and garage policies. We decline that invitation. If the General Assembly wishes to categorically exclude every fleet and garage policy from the mandate of § 38a-336 (a) (2), it knows how to do so. See *Rutter* v. *Janis*, 334 Conn. 722, 734, 224 A.3d 525 (2020) (noting "well settled principle of statutory construction that the legislature knows how to convey its intent expressly . . . or to use broader or limiting terms when it chooses to do so" (internal quotation marks omitted)); *State* v. *Grant*, 294 Conn. 151, 160, 982 A.2d 169 (2009) (legislature knows how to use limiting terms).

We also are mindful that § 38a-336 is a statute with "a broad and remedial purpose"; *Doyle* v. *Metropolitan Property & Casualty Ins. Co.,* supra, 252 Conn. 88 n.5; namely, to "protect the named insured and other additional insureds from suffering an inadequately compensated injury caused by an accident with an inadequately insured automobile." (Internal quotation marks omitted.) Id., 84; see also *Williams* v. *State Farm Mutual Automobile Ins. Co.*, 229 Conn. 359, 373, 641 A.2d 783 (1994) ("our uninsured motorist statute is remedial in nature and designed to protect people injured by unin-

sured motorists"); *Harvey* v. *Travelers Indemnity Co.*, 188 Conn. 245, 250–51, 449 A.2d 157 (1982) ("it is the intent of the legislature to provide broad coverage to victims of uninsured motorists"); cf. *Gormbard* v. *Zurich Ins. Co.*, 279 Conn. 808, 824, 904 A.2d 198 (2006) (noting "the important public policy goals of the uninsured motorist statute"). We therefore must apply § 38a-336 (a) (2) "consistent with the maxim that remedial statutes should be construed liberally in favor of those whom the law is intended to protect [and that] exceptions to those statutes should be construed narrowly." (Internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Edge Fitness, LLC*, 342 Conn. 25, 37, 268 A.3d 630 (2022); see also *Johnson* v. *Preleski*, 335 Conn. 138, 145, 229 A.3d 97 (2020) ("[r]emedial statutes must be afforded a liberal construction in favor of those whom the legislature intended to benefit" (internal quotation marks omitted)); *Gohel* v. *Allstate Ins. Co.*, 61 Conn. App. 806, 815, 768 A.2d 950 (2001) (§ 38a-336 is remedial in nature and "should be construed liberally in favor of those whom the law is intended to protect" (internal quotation marks omitted)). The requirements imposed upon insurers under § 38a-336 (a) (2) are intended to protect typical purchasers of insurance like Blake who do not possess insurance expertise and are not fully aware of the coverage options and relative cost of uninsured motorist coverage. See *Kinsey* v. *Pacific Employers Ins. Co.*, supra, 277 Conn. 414; *Frantz* v. *United States Fleet Leasing, Inc.*, supra, 245 Conn. 739; see also *McDonald* v. *National Union Fire Ins. Co. of Pittsburgh, PA*, supra, 79 Conn. App. 807 (purpose of § 38a-336 (a) (2) "is to facilitate consumers' decision-making process").

In light of the foregoing, we conclude that the construction of § 38a-336 (a) (2) articulated by our Supreme Court in *Frantz* does not apply to the different factual scenario presented by this case. The court, therefore, improperly concluded as a matter of law that the defendant's noncompliance with § 38a-336 (a) (2) was excused. Because the dealership's uninsured motorist coverage was not effectively reduced due to that noncompliance, § 38a-336 (a) (2) dictates that the coverage under the policy was "equal to [the coverage] purchased to protect against loss resulting from the liability imposed by law . . . ." Because the record before us indicates that the liability coverage under the policy exceeded the $292,540.06 in workers' compensation benefits that the decedent received, "a triable issue remains as to the amount of damages that should be awarded [and] summary judgment should not have been rendered on that issue." *Williams* v. *Breyer*, 21 Conn. App. 380, 385, 573 A.2d 765, cert. denied, 215 Conn. 812, 576 A.2d 542 (1990).

## II

The plaintiffs also claim that the court improperly

determined, in its April 13, 2018 articulation following the bifurcated trial, that the policy provided for standard, rather than conversion, uninsured motorist insurance coverage. We disagree.

At the outset, we note that conversion coverage is an "option [that] is available *for an additional premium* to consumers who wish to purchase it *in lieu of standard underinsured motorist coverage under § 38a-336* [and] provides enhanced protection to victims of underinsured motorists . . . ." (Emphasis in original.) *Florestal* v. *Government Employees Ins. Co.*, 236 Conn. 299, 307, 673 A.2d 474 (1996). "In contrast to traditional underinsured motorist coverage, underinsured motorist conversion coverage is not reduced by the amount of any payment received by or on behalf of the tortfeasor or a third party." *Baranowski* v. *Safeco Ins. Co. of America*, 119 Conn. App. 85, 88, 986 A.2d 334 (2010). As our Supreme Court succinctly explained, "conversion coverage . . . means that any [uninsured] motorist benefits [a plaintiff] is entitled to from the defendant will not be reduced by the amount recovered from the legally responsible parties." *Tannone* v. *Amica Mutual Ins. Co.*, supra, 329 Conn. 670 n.4.

The question before us is whether the policy provided standard or conversion coverage to the dealership. It is well established that "[a]n insurance policy is to be interpreted by the same general rules that govern the construction of any written contract . . . . In accordance with those principles, [t]he determinative question is the intent of the parties, that is, what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning." (Internal quotation marks omitted.) *Lexington Ins. Co.* v. *Lexington Healthcare Group, Inc.*, 311 Conn. 29, 37–38, 84 A.3d 1167 (2014). "As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. . . . The determination of whether an insurance policy is ambiguous is a matter of law for the court to decide." (Citation omitted; internal quotation marks omitted.) *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 255 Conn. 295, 305–306, 765 A.2d 891 (2001); see also *Cruz* v. *Visual Perceptions, LLC*, 311 Conn. 93, 101, 84 A.3d 828 (2014) (whether contract language is plain and unambiguous "is a question of law subject to plenary review"). Furthermore, "[i]t is a basic principle of insurance law that policy language will be construed as laymen would understand it and not according to the interpretation of sophisticated underwriters . . . . [T]he policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view." (Internal quotation marks omitted.) *R.T.*

*Vanderbilt Co.* v. *Continental Casualty Co.*, 273 Conn. 448, 462–63, 870 A.2d 1048 (2005).

The policy here is twenty-one pages in length; twenty-five forms and endorsements spanning approximately one hundred pages are appended to the policy. The policy nonetheless is silent as to whether it provides standard or conversion coverage. Unlike other insurance policies; see, e.g., *Serra* v. *West Haven*, 77 Conn. App. 267, 269 n.3, 822 A.2d 1018 (2003); neither the policy nor the appended materials contain any provision indicating whether standard or conversion coverage applies. The only mention of uninsured motorist coverage at all is in the "GARAGE DECLARATIONS" section,[17] but that section does not specify the nature of the coverage provided. As a result, a reasonable layperson in the position of the purchaser of the policy; see *Israel* v. *State Farm Mutual Automobile Ins. Co.*, 259 Conn. 503, 509, 789 A.2d 974 (2002); would not be able to divine from the written policy the nature of the uninsured motorist coverage contained therein. Accordingly, we conclude that the policy is ambiguous as to whether it provides standard or conversion coverage.

In light of that ambiguity, the plaintiffs contend that the contra proferentem canon of construction requires us to construe the policy against the defendant as drafter of the policy. That canon provides that "ambiguities in contract documents are resolved against the party responsible for its drafting . . . . The party who actually does the writing of an instrument will presumably be guided by his own interests and goals in the transaction. He may choose shadings of expression, words more specific or more imprecise, according to the dictates of these interests. . . . A further, related rationale for the rule is that [s]ince one who speaks or writes, can by exactness of expression more easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from ambiguity are resolved in favor of the latter." (Internal quotation marks omitted.) Id., 508–509.

The plaintiffs ignore the fact that "when a policy provision is facially ambiguous, the court should first apply other tools of construction and, if relevant, consult extrinsic evidence of the parties' intentions before construing the [policy] against the drafter." *R.T. Vanderbilt Co.* v. *Hartford Accident & Indemnity Co.*, 171 Conn. App. 61, 90, 156 A.3d 539 (2017), aff'd, 333 Conn. 343, 216 A.3d 629 (2019); see also *Gold* v. *Rowland*, 325 Conn. 146, 160, 156 A.3d 477 (2017) ("the application of contra proferentem is premature in situations [in which] there has not yet been any attempt to resolve the ambiguity through the ordinary interpretive guides— namely, a consideration of the extrinsic evidence" (internal quotation marks omitted)); *Connecticut Ins. Guaranty Assn.* v. *Drown*, 314 Conn. 161, 195, 101 A.3d 200 (2014) (*Rogers, C. J.*, concurring) ("the rule [of

contra proferentem] should be applied as a tie breaker only when all other avenues to determining the parties' intent have been exhausted"); 2 S. Plitt et al., Couch on Insurance (3d Ed. Rev. 2010) § 22:16, pp. 22–93 through 22–94 ("since [the] rule of strict construction of an ambiguous policy against insurer is a rule of last resort, and not to be permitted to frustrate parties' expressed intention if such intention could be otherwise ascertained, where there is extrinsic evidence of parties' intention, which is proffered and admissible, and which resolved ambiguity, albeit in favor of noncoverage, the rule of strict construction need not be applied"); M. Taylor et al., Connecticut Insurance Law (2011) § 2-5:1, p. 35 ("[o]nce a determination is made that the policy is ambiguous, then the court may consider any relevant evidence which demonstrates the intent of the parties at the time that they entered into the policy").

Particularly illustrative is *Fiallo* v. *Allstate Ins. Co.*, 138 Conn. App. 325, 51 A.3d 1193 (2012). The insurance policy in that case contained provisions detailing the nature of both standard " 'Uninsured Motorist Insurance Underinsured Motorist Insurance Coverage' " and " 'Uninsured Motorist Insurance Underinsured Motorist Conversion Insurance Coverage' " and provided corresponding codes for each type of coverage. Id., 336–37. The declaration page, however, did not contain a code or explanation to indicate which type of coverage was provided. Id., 337–38. As a result, this court concluded that the policy was ambiguous in that regard. Id., 339.

Because the policy did not specify whether standard or conversion uninsured motorist coverage applied, this court explained that "the issue of whether the plaintiff purchased standard uninsured . . . motorist coverage or . . . conversion coverage presents a question of historical fact, rather than one of contract construction. Accordingly, the canon of contra proferentem need not be applied automatically. . . . The issue in the present case does not require an interpretation of a policy term that is written by the insurer . . . but rather warrants an inquiry into the circumstances of the purchase of the policy to determine which variety of uninsured . . . motorist coverage the plaintiff opted to purchase so that the intentions of the parties may be discovered and put into effect." (Citations omitted; footnote omitted.) Id., 340–41. For that reason, the court concluded that "[t]he determination of what policy was bought may be resolved by examining extrinsic evidence." Id., 341. As it stated: "Because the reasonable expectations of the insured control when enforcing insurance contracts . . . we conclude that the process best suited to effectuate the intent of the parties where the language is ambiguous as to the issue of historical fact whether the insured elected to buy a particular policy is to examine extrinsic evidence to determine the parties' intentions, and if this examination does not resolve the question, other canons of construction, including perhaps

the doctrine of contra proferentem, may be applied. There is a fundamental distinction between deciding what policy language means, on the one hand, and deciding, on the other hand, whether a particular policy option was bought." (Citation omitted.) Id., 341–42. The court also emphasized that "the issue in the present case called for a factual determination rather than a construction of the terms of the policy drafted by the insurer." Id., 347. Because the trial court had not made "a finding regarding the parties' intentions other than its conclusion that the policy and declarations page were unambiguous," this court "reverse[d] the judgment in part and remand[ed] the case to the [trial] court to determine which coverage the parties intended." Id., 348.

Like *Fiallo*, the present case involves "a factual determination rather than a construction of the terms of the policy drafted by the insurer"; id., 347; for which resort to extrinsic evidence such as trial testimony is appropriate. In considering such evidence, "[t]he determinative question is the intent of the parties . . . ." (Internal quotation marks omitted.) *Connecticut Ins. Guaranty Assn.* v. *Drown*, supra, 314 Conn. 187.

Conversion coverage is an "option [that] is available *for an additional premium* to consumers who wish to purchase it . . . ." (Emphasis in original.) *Florestal* v. *Government Employees Ins. Co.*, supra, 236 Conn. 307; see also General Statutes § 38a-336a (a). At trial, Blake testified that he "wanted to have the minimum amounts [of insurance coverage] required by the state of Connecticut." Blake further testified that he "was trying to find a policy [so] that I could keep the [dealership] ongoing, because . . . we were getting crushed by . . . insurance costs."[18] That evidence undermines the plaintiffs' claim that Blake intended to purchase enhanced coverage for an additional premium pursuant to § 38a-336a.

Also admitted into evidence was a copy of the waiver form. It is undisputed that the defendant failed to disclose to Blake the premium costs for any of the conversion coverage options listed on page four of that document. Although the box for "$100,000 Combined Single Limit" was checked on that page; see footnote 8 of this opinion; Blake testified that he did not check that box. He explained that Castellini, the insurance agent who helped procure the policy, had faxed the waiver form to him with an asterisk on page four where the signature of the named insured was required.[19] Blake testified that the only writing on the waiver form that belonged to him was the signature on page four.

In addition, Blake testified that he did not know what conversion coverage was and did not "understand how conversion coverage works." In his testimony, Blake also confirmed that he did not ask Castellini about conversion coverage. In light of that uncontroverted

evidence, we agree with the trial court's determination that Blake did not intend to purchase uninsured motorist insurance conversion coverage for the dealership.

The plaintiffs nevertheless argue that the terms of the waiver form should be deemed part of the policy, relying on *Harlach* v. *Metropolitan Property & Liability Ins. Co.*, 221 Conn. 185, 602 A.2d 1007 (1992). It is a curious position, given their contention in this appeal that the waiver form was invalid and not the product of a knowing and informed decision on the part of the named insured. We conclude that *Harlach* is factually and contextually distinguishable from the present case.

In *Harlach*, our Supreme Court noted that "[i]t is well settled that an insurance contract must be read to include provisions that the law requires be included and to exclude provisions that the law prohibits. . . . Unless the agreement indicates otherwise, [an applicable] statute existing at the time an agreement is executed becomes a part of it and must be read into it just as if an express provision to that effect were inserted therein." (Citation omitted; internal quotation marks omitted.) Id., 191–92. In light of that precept, the plaintiff in *Harlach* argued that a specific statutory provision should be read into the insurance policy in question— namely, the requirement of the precursor to § 38a-336 (a) (2) that uninsured motorist coverage be equal to the limits of liability coverage unless a lesser amount is requested in writing. Id., 191. The court then focused its attention on "uncontroverted" evidence that the plaintiff had submitted an effective request to lower the amount of her uninsured motorist coverage, and did not further discuss the issue of incorporating statutory language into an insurance policy. Id., 192. Notably, the cases relied on by *Harlach* originate from the observation of our Supreme Court in 1940 that "*statutes* existing at the time a contract is made become a part of it and must be read into it just as if an express provision to that effect were inserted therein, except where the contract discloses a contrary intention." (Emphasis added.) *Ciarleglio* v. *Benedict & Co.*, 127 Conn. 291, 293, 16 A.2d 593 (1940).

This case is not *Harlach*. The plaintiffs here are not seeking to incorporate any statutory provision into the policy. Rather, they are seeking to incorporate certain language from a preprinted waiver form; see footnote 6 of this opinion; to compel the conclusion that Blake knowingly selected conversion coverage. That language states in relevant part that "[i]f you check more than one [coverage option] box, your policy will be issued with the highest level of coverage selected." Because the partially completed waiver form that Castellini sent to Blake had multiple boxes checked; see footnote 8 of this opinion; the plaintiffs argue that this language must be incorporated into the policy and strictly construed as an election of conversion coverage by Blake.

Yet the plaintiffs have provided no authority in which a Connecticut court has held that language from a preprinted waiver form—as opposed to a statutory provision—necessarily must be read into an insurance policy. We likewise are unaware of any such authority.

Apart from that shortcoming, *Harlach* is factually distinguishable. Unlike the present case, the named insured in *Harlach*, in addition to signing his name, had "initialed the minimum coverage option" on the written request to reduce uninsured motorist coverage. *Harlach* v. *Metropolitan Property & Liability Ins. Co.*, supra, 221 Conn. 188. By contrast, Blake testified that he did not select *any* of the boxes for a specific coverage option and had simply signed his name on the last page of the form that his insurance agent had provided. Moreover, Blake testified that he did not read the waiver form "word for word"; instead, he "read the portions that were filled in, and [he] looked it over in general, and [he] signed it." Blake also testified that he did not know what conversion coverage was, that he did not "understand how conversion coverage works," and that he did not ask Castellini about conversion coverage.

In addition, the written request to reduce uninsured motorist coverage in *Harlach* "made it very clear that increased amounts of coverage were available at a higher premium . . . ." *Harlach* v. *Metropolitan Property & Liability Ins. Co.*, supra, 221 Conn. 193. In the present case, the waiver form did not provide premium costs for any of the eighty-two coverage options listed on pages three and four of that document; the area designated for the "Total Coverage Premium" for each of those options on the form was blank. Accordingly, unlike in *Harlach*, the waiver form here did not comply with the statutory requirements governing requests to reduce uninsured motorist coverage. See id., 192.

Furthermore, the plaintiff in *Harlach* was seeking to invalidate a written request that the named insured had signed due to his "mistaken [understanding] as to what coverage he was surrendering . . . ." Id., 190. By contrast, the plaintiffs in the present case seek to invalidate the waiver form signed by Blake due to the failure of the defendant insurer to comply with the statutory requirements of § 38a-336 (a) (2), while paradoxically urging this court to incorporate by reference certain language contained on that preprinted form. Having determined in part I of this opinion that the waiver form was an ineffective attempt to reduce the uninsured motorist coverage under the policy, and in light of the uncontroverted evidence in the record before us, we decline to incorporate the language in question from that preprinted form into the policy. The trial court, therefore, properly concluded that the policy provided for standard, rather than conversion, uninsured motorist insurance coverage.

The judgment is reversed with respect to the issue

of uninsured motorist coverage limitations under the policy and the case is remanded to the trial court for further proceedings in accordance with this opinion; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The decedent commenced this civil action on March 2, 2016. Following his death in 2019, the court granted the motion to substitute the coadministrators of his estate as the plaintiffs, and all references herein to the plaintiffs are to the substitute plaintiffs.

[2] Also named as defendants in the complaint were United Services Automobile Association and Marisol Yanez-Ventura. Prior to trial, the action against United Services Automobile Association was withdrawn. Yanez-Ventura did not appear before the Superior Court and has not appeared in this appeal. For purposes of clarity, we refer to Wesco Insurance Company as the defendant and Yanez-Ventura by name in this opinion.

[3] The plaintiffs also claim that the court improperly concluded that a written request to reduce uninsured motorist coverage executed by an agent of the dealership was valid and the product of a knowing and informed decision. In light of our resolution of their principal contention, we do not address that claim.

[4] The first two counts of the complaint pertained to Yanez-Ventura and United Services Automobile Association, respectively. See footnote 2 of this opinion.

[5] Throughout this opinion, the term uninsured motorist coverage also encompasses underinsured motorist coverage. See *Rydingsword* v. *Liberty Mutual Ins. Co.*, 224 Conn. 8, 14 n.11, 615 A.2d 1032 (1992).

[6] That document is a preprinted form that bears the inscription "© Insurance Services Office, Inc., 2011" on the bottom of each of its four pages.

[7] At oral argument before this court, the defendant's counsel conceded that "[t]here is no question that the [waiver form] . . . did not comply strictly with the statute because it . . . was missing the premium amounts."

[8] The waiver form is four pages in length. The top of the third page states: "SELECT <u>ONE</u> OPTION UNDER <u>EITHER</u> STANDARD [UNINSURED MOTORIST] COVERAGE <u>OR</u> CONVERSION [UNINSURED MOTORIST] COVERAGE. <u>Do Not Check More Than One Box Below</u>." Nonetheless, the boxes for $100,000 in coverage were checked on *both* the standard uninsured motorist option on page three and the conversion uninsured motorist option on page four of the waiver form.

[9] On February 16, 2018, the decedent filed an appeal of that decision with this court. By order dated May 23, 2018, this court dismissed that appeal for lack of a final judgment.

[10] In his November 20, 2018 response to interrogatories, the decedent admitted that he had received $292,540.06 in workers' compensation benefits. A copy of that pleading was appended to the defendant's motion for summary judgment.

[11] Section 38a-334-6 (d) (1) of the Regulations of Connecticut State Agencies provides in relevant part: "The limit of the insurer's liability may not be less than the applicable limits for bodily injury liability specified in subsection (a) of [General Statutes §] 14-112 . . . except that the policy may provide for the reduction of limits to the extent that damages have been . . . (B) paid or are payable under any workers' compensation law . . . ."

[12] The policy here provided $1 million in liability coverage per accident.

[13] As the Supreme Court has observed, the statutory language construed in *Pasion* "is virtually identical" to the statutory language contained in § 38a-336 (a) (2). See *Frantz* v. *United States Fleet Leasing, Inc.*, supra, 245 Conn. 734 n.16.

[14] The insurance policy at issue in *Frantz* covered 2208 vehicles; *Frantz* v. *United States Fleet Leasing, Inc.*, supra, 245 Conn. 731; *Kinsey* involved coverage of "more than 1000 vehicles"; *Kinsey* v. *Pacific Employers Ins. Co.*, supra, 277 Conn. 413; and *McDonald* involved coverage of "a fleet of vehicles [used] to carry on a large commercial enterprise . . . ." *McDonald* v. *National Union Fire Ins. Co. of Pittsburgh, PA*, supra, 79 Conn. App. 807.

[15] We reiterate that, throughout its memorandum of decision, the court indicated that it had found Blake's testimony to be credible.

[16] That Blake was not fully apprised of the uninsured motorist options when signing the waiver form is exemplified by the following colloquy on direct examination:

"[The Defendant's Counsel]: [S]ir, you'll notice on pages three and four [of the waiver form], the [lines] for total coverage premium . . . those are

all blank, correct?

"[Blake]: . . . [T]hat's correct.

"[The Defendant's Counsel]: [On pages] three and four . . . where premiums would be listed, those are blank, right?

"[Blake]: That's correct.

"[The Defendant's Counsel]: All right. And if those amounts had been listed, would you have selected a different [uninsured motorist] limit?

"[Blake]: No, I mean—

"[The Defendant's Counsel]: And why not?

"[Blake]: Well, the $100,000 was what was required . . . ."

Blake repeatedly testified throughout the trial that he wanted the minimum amount of uninsured motorist coverage allowable under Connecticut law, and the court made such a finding in its decision. Blake also confirmed that he mistakenly believed that the statutory minimum was $100,000 and testified that he did not know that the statutory minimum actually was $40,000 until so informed at trial. That testimony suggests that, if he had been advised of the correct statutory minimum and corresponding premium costs, Blake may well have selected a different coverage option.

[17] "The declarations page is regarded as part of the insurance contract . . . and contains the terms most likely to have been requested by the insured . . . ." (Internal quotation marks omitted.) *Fiallo* v. *Allstate Ins. Co.*, 138 Conn. App. 325, 336 n.3, 51 A.3d 1193 (2012).

[18] In light of that testimony, the court made a finding in its memorandum of decision that Blake wanted "the lowest possible [uninsured motorist] coverage that was allowed" under Connecticut law.

[19] Blake also was asked if any instructions accompanied that correspondence from Castellini. Blake explained that the instructions from Castellini had stated, "Is this what you want and, if so, sign it and send it back to me."